[No. G038644. Fourth Dist., Div. Three. July 25, 2008.]

In re the Marriage of YVETTE E. and JEFFREY D. BARDZIK.
YVETTE E. BARDZIK, Respondent, v.
JEFFREY D. BARDZIK, Appellant.

COUNSEL

Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer for Appellant.

Kerwin & Associates and William F. Kerwin for Respondent.

OPINION

SILLS, P. J.—

### I.   Summary

This family law appeal arising out of a proceeding to modify child support offers two highly unusual facts: First, the mother was able to retire from her

job as a deputy sheriff after 20 years service at the age of 42, while still young enough to have two teenage boys.

That doesn't happen often. Indeed, we know of no other case involving "early" retirement in a child support context.[1]

Second, the existing order that was the object of the modification proceeding—that is, the status quo going into the modification proceeding—involved no existing obligation on the part of either parent to pay child support. It was a zero-zero order.

The zero-zero order is unusual too. The reason was that in 2000, when the last operative child support order was made, both parents were working as deputy sheriffs, both made about the same amount of money, and both agreed to share custody of the two boys 50-50.

The case also requires us to confront an anomalous result at the trial court level: The modification proceeding resulted in a change of custody of *one* of the boys, an adopted "special needs child," *to the father*, with 50-50 custody remaining for the other boy. That is, the father now clearly has more time in terms of the total custody than mother, and has primary custody of the couple's special needs teenager. And yet the ensuing child support order now requires the father to pay the mother! The reason for this anomaly is the wider *disparity* in incomes in the wake of the mother's retirement. (The father's payment to the mother is $388 a month.) To put the result another way, this is a case where the "custodial" parent and the "payor parent" are the same person.

And yet, despite the unusual facts and the anomalous result, the resolution of this appeal ultimately turns on a very common point: If one parent seeks to *modify* an existing order so as to have income imputed to the other parent, the parent seeking imputation—that is, in that context, the parent seeking to overturn the status quo—bears the burden of proof of showing that the other parent has the ability and opportunity to earn that imputed income. (Compare *In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367 [263 Cal.Rptr. 243] [need to show ability and opportunity] with *In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317 [16 Cal.Rptr.3d 489] [no imputation at order to show cause hearing where parent seeking order imputing income based on earning capacity failed to present any competent evidence other parent had ability or opportunity to earn imputed income].)

---

[1] The two "early retirement" cases in the case law, *In re Marriage of Sinks* (1988) 204 Cal.App.3d 586 [251 Cal.Rptr. 379], and *In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71 [46 Cal.Rptr.2d 8] both arose out of proceedings to modify spousal support orders.

In this case, the father brought an order to show cause (OSC) proceeding to ratify the change of custody of the special needs teenager from 50-50 to primary to him. He also sought an order that the mother turn over to him a certain $1,000 a month that the *state* was paying as adoption assistance on behalf of the special needs teenager. He did *not*, however, bring an OSC to change the existing child support order of zero-zero.

For her part, the mother, having recently retired, brought her own OSC, *also* seeking the same change of custody, and merely (and ambiguously) requesting that the court make a guideline support order in light of that anticipated change. In his responsive pleading to the mother's OSC, the father requested that the trial court impute income to the mother based on her final salary as a deputy sheriff just prior to her retirement. (See Fam. Code, § 213, subd. (a) ["In a hearing on an order to show cause . . . the responding party may seek affirmative relief alternative to that requested by the moving party, on the same issues raised by the moving party . . . ."].)

When the combined proceedings came on for hearing, the father devoted almost all his evidentiary case to his request that the mother not be allowed to keep the $1,000 adoption assistance monies, and that the court direct it to go to him. He prevailed on that request, which is otherwise not before us in this appeal.

However, other than presenting evidence of what the mother had been making at the time of her retirement, the father presented no evidence of her vocational abilities or of any opportunities she might have to earn additional income. The father didn't, for example, show that the mother even *could* go back to work as a deputy sheriff, or that there were opportunities for her to work in related fields. He didn't, for example, show that she had the opportunity to earn money as a supervisor in a security company, or might have worked in some auxiliary capacity for her old employer. The father was content merely to point to the fact of her retirement and the fact of what she had earned at the time of her retirement. Indeed, the trial court was just a little surprised that the father rested his case after proving so little, and correctly recognized that the father simply had not carried his burden of showing ability and opportunity to earn imputed income and declined to make an order imputing income to her.

We are required to affirm the order. Simply showing that the mother had retired before the age of 65 and what she made before her retirement was not enough to show ability and opportunity to earn.

## II.   The Procedural History

Jeffrey D. Bardzik (father) and Yvette E. Bardzik (mother) were married and were both Orange County deputy sheriffs when they were divorced in 1994. They had two sons. One, Brian, was about 16 years old by 2006; the other, Kevin, was about 15. Kevin is the special needs child referred to above. He had been adopted toward the end of the couple's marriage. His biological mother had been a drug addict, and to this day he suffers from attention deficit disorder.

While there were a number of proceedings between the couple during the 1990's, for purposes of this appeal we may begin with the status quo as it stood as of an order made in November 2000. Custody of the two boys was to be split 50-50, and, given the relatively similar incomes that each party had as a deputy sheriff, child support was set at zero-zero.

That status quo was reiterated in the outcome of a modification OSC held in February 2006. (The February 2006 OSC is not the one we are concerned with in this appeal.)[2] There were only a few substantive changes resulting from the February 2006 proceeding, namely that both parents attend conjoint counseling, and that mother have the sole right to determine type and dosage of medication for Kevin. Other than that, the basics of the status quo—50-50 custody and zero-zero child support—remained as the parties entered the spring of 2006.

Then, in mid-April—before there was even a formal document embodying the findings and orders of the OSC held two months before—mother brought another OSC to modify the existing order. As we have noted, this case has some unusual facts, and mother's OSC was itself unusual: In her moving papers mother asked that the trial court change the 50-50 custody arrange-ment so that *father* would have primary custody of Kevin. Essentially, mother's request was a ratification of a de facto change already brought about by some behavior problems Kevin had been having (he had just been expelled from the ninth grade). Mother (modestly) asked only for generous visitation for herself. She also (ambiguously) asked for a "guideline" support order, without making it clear whether, in light of the change, she would be

---

[2] Just as every unhappy family is unhappy in its own way, every divorce has its own backstory. In this appeal the parties have endeavored to spare us that backstory, so the clerk's transcript appears a bit more sparse than it might have been. Other than the fact that this couple has been fighting *a lot* since their divorce in the 1990's, there's not much more to say about the February 2006 OSC. Indeed, all we have in our record regarding that OSC is the minute order, and that minute order is silent as to precisely who the moving party was (or were, if both).

paying father or father would be paying her. And she asked that the previous order requiring conjoint counseling be lifted.[3]

Another unusual fact to be found in mother's declaration was the fait accompli of her retirement from the sheriff's office the previous year. (We may presume that *if* the support order had been something other than zero-zero, the impact of mother's retirement would have been litigated earlier.) In any event, at the hearing mother would testify that she retired in order to spend more time with her children (including two more sons from a new marriage) given the stress of her duties as a jailer in the maximum security jail, including working midnights, being in a "dangerous situation," and being "constantly sick." Mother's accompanying income and expense declaration showed a monthly income of $2,577, which was her retirement pay.

Mother's OSC was set for June 8, 2006. A week before the hearing, however, father filed his own OSC for modification. Like mother, he wanted an order formally changing physical custody of Kevin to him. Unlike her, his OSC did not raise the issue of support. Rather, to the degree that it was focused on financial issues, father wanted an order requiring "100% of the adoption assistance monies received" on Kevin's behalf to go to him; after all, he now had primary physical custody of Kevin. The result was that the two OSC's were combined for hearing on August 22.

Father did not file his own OSC attempting to have income imputed to mother in the wake of her recent and early retirement. His responsive pleadings simply requested "the Court set child support in an amount in accordance with the California guideline, taking into consideration the parties' gross incomes and time share each parent shares with the children."

The issue of retirement was, however, addressed in father's trial brief, and, in contrast to the mother's request, was *un*ambiguous. Father asserted that mother "should be imputed income at her pre-retirement ability to earn" because mother had not given any "health reason or any other reason for her early retirement other than the desire to be a 'stay-at-home' mom." In that regard, father confidently put forth DissoMaster figures based on mother's preretirement income ($7,325 a month) suggesting that, with Kevin being mostly with him, mother would owe him about $742 a month.

---

[3] We realize that declarations are typically prepared by attorneys, but we would remind counsel that declarations are supposed to reflect the statements of the declarant under oath. (Nor are declarations a form of legal argument under oath.) In mother's declaration we read this line, as if written by a frustrated outsider: "Counseling is not going to help these people, what's going to help them is being separated from each other."

At the hearing, though, the only evidence father presented on the imputation issue was from mother herself, and she merely testified that she had served 20 years as a deputy sheriff, she was 43 years old, that if she went back to work in the office she would have to go in as a "new deputy," and that she retired because her family was suffering from the extreme stress of her working in the maximum security part of the Orange County Jail.

There was also some brief testimony (no more than three questions) about mother having signed up, prior to retirement, to be something called an "extra-help deputy." The subject was, however, quickly dropped after mother testified that she had not been an extra-help deputy after retirement, so there was no evidence before the court that it was even a paying position or, if so, how much of mother's time or how much income to her it would entail.[4]

In his case-in-chief, father testified almost entirely about the adoption assistance issue.

And that was it. At the very end of father's testimony, mother's attorney told the court that mother was willing to stipulate to having a vocational evaluation. At that point the court noted that father hadn't made the "case yet on the imputation of income" and inquired if there were any other witnesses. There were none. Then followed oral argument, with the court making it clear that it was "not going to impute income without further evidence that she has the ability to earn what she earned before." The court made a support order which, given the relative incomes and time shares, resulted in father owing mother $388 a month. The order also expressly refused "to impute income" to mother "without further evidence." From that order father timely appealed, primarily asserting that the trial court was *obligated as a matter of law* to impute income to mother based on her early retirement.[5]

---

[4] Appellate counsel's efforts to cure this lacuna in a petition for rehearing by citing us to a memorandum of understanding between the county and a deputy sheriffs' association (as to what someone might be able to earn as an "extra-help deputy" if he or she worked the maximum hours at the maximum rate) is unavailing. That memorandum is not part of the record before us. We review the record put before the trial judge, and the trial judge did not have the benefit of any evidence as to whether being an "extra-help deputy" was even a paying job or, if so, how much mother could make working at it.

[5] This is the fair import of the very first heading in the argument section of the opening brief, which asserts: "Earning capacity is founded in sound and strong public policy, and being in the best interest of the subject children, and of a measurable quantity, should have been imputed." (Capitalization omitted.)

## III. The Imputation Issue

### A. *Background*

California courts have long asserted the power to impute income to supporting spouses and parents based on ability to earn income, as distinct from actual income. The first mention of the idea in the California reported decisions appeared at the very beginning of the Grant administration. (See *Eidenmuller v. Eidenmuller* (1869) 37 Cal. 364, 366.)[6]

However, historically, California courts also put self-imposed restraints on their power to impute income where it does not actually exist. For most of California legal history, courts confined that power exclusively to situations where supporting parents or spouses had reduced their actual incomes out of a bad motivation to reduce their support payments. A memorable example of such bad motivation was *Pencovic v. Pencovic* (1955) 45 Cal.2d 97 [287 P.2d 501], where there was evidence that the father went into the religious guru business (he changed his name to Krishna Venta and founded a religious society in which he was its "Master," but ostensibly held no income or wealth in his own name) precisely in order to hide his real income. (He earlier admitted to the mother that he would " 'plan his life accordingly so he would be protected.' " (*Id.* at p. 100.)) Needless to say, the scam did not work, with the Supreme Court holding that the religious "gifts" he was receiving really were his income, and further saying, in any event, since he was "an able-bodied man," the "trial court could reasonably conclude that he had the earning capacity to discharge the obligation of the support award." (*Id.* at p. 102.) He could not "evade" his obligation by "refusing for religious reasons to seek or accept gainful employment." (*Ibid.*)

By the third quarter of the 20th century, there had been enough cases of courts limiting the use of the power that Justice Lillie could observe, in *Philbin v. Philbin* (1971) 19 Cal.App.3d 115, 121 [96 Cal.Rptr. 408], that the power had been "applied only when it appears from the record that there is a deliberate attempt on the part of the husband to avoid his financial family responsibilities by refusing to seek or accept gainful employment . . . wilfully refusing to secure or take a job . . . deliberately not applying himself to his business . . . intentionally depressing his income to an artificial low . . . or intentionally leaving his employment to go into another business." (Citations omitted.) For Hollywood celebrity Regis Philbin, for example, who was

---

[6] A short opinion, and the mention was dicta. The *Eidenmuller* court cited the "classic" 19th century family law treatise, Bishop on Marriage and Divorce, section 604, as its authority. (Cf. Wardle, *What Is Marriage?* (2006) 6 Whittier J. Child & Fam. Advocacy 53, 61 [describing Joel Bishop's treatise as "classic"].)

simply going through a patch of (relatively) low income, having done nothing to "depress his income," a modification downward was perfectly in order. (*Ibid.*)

While technically dicta (there was no showing of any possibility of Regis Philbin earning any more money regardless of his motives), perception of the *Philbin* case soon hardened into the "*Philbin* rule." As this court would later put it in *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1217 [45 Cal.Rptr.2d 555], the *Philbin* rule permitted "consideration of a parent's earning capacity in determining child support *only* when the payor's actions are motivated by a deliberate attempt to avoid family financial responsibilities." (Original italics.)

Perhaps the best latter-day example of the newly hardened "rule" was in *In re Marriage of Williams* (1984) 155 Cal.App.3d 57 [202 Cal.Rptr. 10], where the payor parent and his new spouse had quit their jobs to move to Nevada to avoid high California living costs, and the custodial parent sought modification *upward* based on a supposed increase in income to the payor parent from his new spouse. Citing *Philbin*, the *Williams* court applied this blanket rule: "The [imputation] standard is not imposed unless there is some conduct by the supporting spouse indicating deliberate behavior designed to avoid his financial responsibilities to his children." (*Williams, supra,* 155 Cal.App.3d at p. 62.)

Federal welfare reform beginning in the 1980's pushed states toward uniform standards for child support awards. (See generally *Clark v. Superior Court* (1998) 62 Cal.App.4th 576, 578–580 [73 Cal.Rptr.2d 53].) With the enactment of the Agnos Child Support Standards Act of 1984, the Legislature observed, in Civil Code former section 4720, subdivision (a), enacted in 1984, that "California has no single standard to promote equitable, adequate child support awards." In subdivision (b) of Civil Code former section 4720, the Legislature also found—"lamented" would be just as accurate a word— that "The current method of setting child support awards has led to a substantial variation in these awards among families with similar circumstances and resources." (See also *In re Marriage of Kepley* (1987) 193 Cal.App.3d 946, 951 [238 Cal.Rptr. 691] ["In adopting the Agnos Act, the Legislature made express findings that the lack of a single standard to promote fair and adequate child support awards led to substantial variation in awards among similarly situated families."].)

The goal of uniform standards applying to families with similar circumstances and resources remains to this date, currently embodied in Family Code section 4050, enacted in 1993. Section 4050 reads: "In adopting the statewide uniform guideline provided in this article, it is the intention of the Legislature

to ensure that this state remains in compliance with federal regulations for child support guidelines." The strength of that policy is best exemplified by the adoption of a complex algebraic formula used to calculate the "statewide uniform guideline for determining child support orders." (Fam. Code, § 4055, subd. (a).)

Also part of the 1984 Agnos Child Support Standards Act was the addition of language, first appearing in Civil Code former section 4721, subdivision (a), that in setting what was then a "minimum mandatory" award, the "court shall also consider, to the extent consistent with the best interests of the child or children, the earning capacity of either or both parents." (See Stats. 1984, ch. 1605, § 4, pp. 5664, 5666.) Because this language contained no limitations concerning "deliberate behavior" aimed at avoiding financial responsibilities, it would be construed by later courts as effectively abrogating the *Philbin* rule. (E.g., *In re Marriage of Nolte* (1987) 191 Cal.App.3d 966, 972–973 [236 Cal.Rptr. 706]; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 994–995 [64 Cal.Rptr.2d 383].)[7]

The consideration of earning capacity was a natural accompaniment to the adoption of the complex child support formula now embodied in Family Code section 4055. Just before the adoption of the Family Code—the last time "earning capacity" language was seen in the Civil Code—it was in the same statute, Civil Code former section 4720.2, which set forth the algebraic formula (in subd. (a)). The statute contained language giving the court *discretion* (the word "shall" that first appeared in the 1984 version dropped out along the way) to "consider the earning capacity of a parent in lieu of that parents income, consistent with the best interests of the child" (in Civ. Code, former § 4720.2, subd. (g)(1)(C)(2)). When the Family Code was enacted, Civil Code former section 4720.2 subdivision (g)(1)(C)(2) appeared as a section in its own right, as Family Code section 4058, subdivision (b).

However, it is readily apparent that the authority to impute income based on earning capacity exists in some tension with the goal of uniform standards for families with similar circumstances and resources. *Without evidence* of ability or opportunity to earn the money, the power to impute income would easily devolve into a trial judge's power to arbitrarily establish a support order at any given level, plucked from midair, just as long as it is over the level otherwise required by the payor parent's actual, taxable income. Appellate courts have countered that danger with what might be

---

[7] A latter day variation on the *Philbin* rule might be described as the "liar liar pants on fire" corollary, as shown in *In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28 [33 Cal.Rptr.3d 246]. There, the payor parent lied—egregiously—on a loan application, and the appellate court thought that was enough to prove capacity to earn that income, despite there being no question as to what the payor parent's income was as measured by tax returns.

termed the *"Regnery* rule," after *In re Marriage of Regnery, supra,* 214 Cal.App.3d 1367, 1372–1373.

The *"Regnery* rule" is essentially a judicial gloss on the words "earning capacity" as they appear in Family Code section 4058, subdivision (b).[8] Citing from a digest of words and phrases and a workers' compensation case, the *Regnery* court announced a "three-prong test before the capacity to earn standard may be applied." The three tests are: "ability to work," "willingness to work," and "opportunity to work which means an employer who is willing to hire." (*Regnery, supra,* 214 Cal.App.3d at p. 1372, citing 14 Words and Phrases (1952) Earning Capacity, pp. 27–28 and *West v. Industrial Acc. Com.* (1947) 79 Cal.App.2d 711, 722 [180 P.2d 972].)

Later courts, recognizing that the second element, willingness to work, should be taken for granted, recast *Regnery's* three-prong test as a simple two-prong test: ability and opportunity. (E.g., *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1392 [111 Cal.Rptr.2d 487] ["So long as a parent has an earning capacity, that is, the ability and the opportunity to earn income, the trial court may attribute income."]; *State of Oregon v. Vargas* (1999) 70 Cal.App.4th 1123, 1126 [83 Cal.Rptr.2d 229] ["This rule has been modified to include only the first and third prongs; thus, the definition of earning capacity is satisfied when the payer has both the ability and opportunity to work."].)[9]

---

[8] Ironically, the *"Regnery* rule," like the earlier *"Philbin* rule," arose out of dicta from the source opinion; indeed the *Regnery* case itself is essentially a corollary of *Philbin.* The court framed the "issue" of the case as "whether [the payor parent] deliberately remained unemployed." (*Regnery, supra,* 214 Cal.App.3d at p. 1375.) The point of the case is that a trial court can look to the "entire background" of a case in determining whether a payor parent is deliberately trying to avoid paying support. (*Id.* at p. 1376.) More specifically, in *Regnery* a highly skilled senior cost accountant didn't pay child support when he *had* a job, and quit his job just before a contempt hearing on his failure to pay that support. (*Id.* at p. 1373.) Later, he claimed he couldn't get one, a story that didn't wash with either the trial or appellate court given his "history." (See *id.* at pp. 1374–1375.)

[9] We have no occasion in this opinion to deal with how ability and opportunity fit within that eddy of imputation law that might be called "high asset cases," where, Bertie Wooster-like, there never really seems to be any question that the payor would actually get a job, and the issue involved just how far the court could go into imputing income from return on assets. (E.g., *In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353 [119 Cal.Rptr.2d 430] [trial court imputed based on idea that wastrel parent would continue to liquidate family assets]; *In re Marriage of Destein, supra,* 91 Cal.App.4th 1385 [court could use assets that were historically nonincome producing]; *In re Marriage of Williams* (2007) 150 Cal.App.4th 1221 [58 Cal.Rptr.3d 877] [involving a dot-com millionaire: "Both parties are wealthy and unemployed."].)

## B. *The Burden of Proof*

■ A *modification* proceeding by definition presumes a change in an already-determined status quo. As is *almost* the case throughout the law, the moving party in a modification proceeding bears the burden of proof of showing changed circumstances that justify a new court order. (We do not and need not in this case address the impact of the burden of proof on an imputed income issue in the context of an initial judgment of dissolution.)

So it is with family court OSC's to modify support orders. As to such proceedings, there can be no doubt that it is the moving party who bears the burden of showing sufficient facts to establish the change of circumstances that justifies modifying what a previous court order has already wrought. (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 556 [14 Cal.Rptr.3d 482]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2007) ¶ 17:26, p. 17-11 (rev. # 1, 2007); accord, *In re Marriage of Stephenson, supra*, 39 Cal.App.4th 71.[10])

We say the case throughout almost all the law, because there is one instance, also in the context of a previously established court child support order, where the moving party effectively bears no burden at all to show a change of circumstances. Or, perhaps better put, it is an instance where the moving party's burden is so light—literally nothing more than filing a modification proceeding in the first place—that it really cannot be described as a "burden."

The particular instance to which we refer is where a previous child support order does not already conform to the guideline formula in Family Code section 4055 (which would normally—unless something has gone wrong—be

---

[10] *Stephenson* perfectly demonstrates how the burden of proof for the modification of a support order is on the moving party. There, the payor spouse decided, in August, to take what was essentially a golden handshake deal offered him by his employer. The deal allowed him to retire and receive eight and one-half months salary as severance pay. If he didn't accept, he would probably have been laid off anyway, and would have lost the severance pay. The trial court reduced the support payment based on changed circumstances—and did so then and there. The appellate court, however, noted that, given the severance pay—which it considered the equivalent to a continuation of the payor spouse's regular salary—the effect of *immediately* reducing the support payment was to impermissibly shift the burden of showing that the *payor* spouse was actually receiving a lower income to the *payee* spouse: "By prematurely reducing spousal support prospectively, the trial court shifted the ultimate burden of proof from Leslie to Norlene to establish a change of circumstances warranting modification of the monthly spousal support order." (*Stephenson, supra*, 39 Cal.App.4th at p. 81.) Since the payor spouse was the moving party, the burden was appropriately on him to show a reduction in income from his retirement. (*Id.* at p. 77 ["The moving party bears the burden of establishing a material change of circumstances since the last order was made in order to obtain modification of the spousal support order."].)

an order predating the adoption of section 4055). Section 4069 of the Family Code provides that the very existence of the guideline itself is enough by itself to modify an existing, preguideline support order to bring it into compliance with the guidelines set out in Family Code section 4055. (See also Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 17:26, p. 17-11 ["Ordinarily, a *factual* change of circumstances is required . . . . However, by statute, child support orders predating the Fam.C. §4050 et seq. . . . are *per se modifiable* when application of the current formula and standards would yield a different amount of support . . . ."].)

Then again, as a matter of the linguistic canon, *expressio unius*, the exception set out in Family Code section 4069 only proves the more basic rule that it is the moving party who has the burden of showing a change of circumstances warranting modification. (Cf. *In re Marriage of Kepley, supra*, 193 Cal.App.3d 946.)[11]

■ The burden of proof as to ability and opportunity to earn imputed income (or lack thereof) plays out differently depending on the status quo going into the modification proceeding. For example, in the very ordinary situation where the payor parent loses his or her job and seeks a reduction in court-ordered support based on the changed circumstances of lack of income, it will be the payor parent, as moving party, who bears the burden of showing a *lack* of ability and opportunity to earn income. (E.g., *In re Marriage of Leonard, supra*, 119 Cal.App.4th 546 [burden carried as to current income, but retroactivity to date of loss of job discretionarily denied because of substantial assets to bridge gap]; *In re Marriage of Eggers* (2005) 131 Cal.App.4th 695 [32 Cal.Rptr.3d 292] [reversing denial of requested change in light of involuntary job loss]; *In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373 [74 Cal.Rptr.2d 636] [burden carried in spousal support case where supporting spouse was a doctor who was fired from job at age 66 and subsequent efforts to find work or open practice were futile].)

Contrast that situation with another one—relatively common in the published cases—where the *payor* parent is the one seeking imputation of income to the custodial parent, based upon a recent decision of the custodial parent to quit work. In effect, in such cases the payor parent seeks an order lowering child support in light of a contribution only *hypothetically* made

---

[11] *Kepley* shows how Family Code section 4069 can swamp a modification proceeding. There, the custodial parent who lived in a cohabitant's house sought an increase in support to bring it up to the level of the statutory minimum, but the trial court denied the increase because of the payor parent's loss of ability to work overtime and because of his recent victimization by a fraudulent investment scheme. On appeal, the payor parent argued that income should have been imputed to the caretaker parent, but the point was moot, because there was nothing to justify denial of the increase to the statutory minimum, so the case had to go back for further proceedings.

(imputed) to the custodial parent based on the custodial parent's ability and opportunity to earn. (E.g., *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331 [66 Cal.Rptr.2d 393] [burden carried]; *In re Marriage of Hinman, supra*, 55 Cal.App.4th 988 [burden carried].)

Before turning to what sort of evidence will (or won't) carry a burden and in what context, one more rule must be noted. This rule is grounded in the commonsense proposition that you can lead someone to a want ad but you can't make them apply for the job. That is, when a parent does have the burden of showing that the other parent has the ability and opportunity to earn at a given level, that burden does *not* include actually showing that the parent to whom the income would be imputed *would* have gotten a given job *if* he or she had applied. As we just said, the rule is only common sense: Readers need only use a little imagination to think of all the ways that a parent with both ability to do a job and the opportunity to get it could subtly sabotage a job application or interview.[12]

*In re Marriage of LaBass & Munsee, supra*, 56 Cal.App.4th 1331, nicely illustrates the distinction between (1) a payor parent's having a burden of proof that the custodial parent has the ability and opportunity to earn a given income, and (2) a payor parent's *not* having a burden of proof that the other parent *would* necessarily have gotten the job if applied for. In *LaBass & Munsee*, the moving party was the payor parent, who was left behind in Sacramento when, just before the divorce became final, the custodial parent moved with the children to a rent-free quarters (provided by her parents), taking the children with her. During the marriage the custodial parent had worked as a full-time high school teacher and then later at Home Depot. (Her master's degree was in English literature.) Upon moving to Southern California, though, she took only part-time community college teaching jobs so as to pursue a second master's degree, this time in fine arts. (*Id.* at p. 1335.) (The court allowing her to move contemplated that she would do so and obtain full-time work or pursue a full Ph.D.) The custodial parent also had a substitute teaching credential, which would have allowed her to teach anywhere in the Los Angeles Unified School District. While the court did not say it explicitly, it appears that the support order established at the time of the divorce itself had been predicated on the custodial parent's full-time employment. (That's the natural implication of the court's narrative.) (See *id.* at pp. 1334–1335.)

At the hearing on the modification motion, the payor parent did a model job of showing ability and opportunity to earn on the part of the custodial parent. He presented: The fact she had a teaching credential allowing her to

---

[12] Consider the comic strip Willy 'n Ethel, the humor of which is often a variation of all the ways Willy can think of to actually slip out of finding gainful employment.

be a substitute teacher in a large school district (ability); opinion testimony (with proper foundation) that the custodial parent could secure full-time employment in that district[13] (opportunity); numerous want ads soliciting applications from persons with the custodial parent's qualifications (opportunity) and a pay scale obtained from the large school district showing what a person with the custodial parent's qualifications would make as a starting salary (thus correlating ability and opportunity with the income to be imputed). (See *In re Marriage of LaBass & Munsee, supra,* 56 Cal.App.4th at p. 1335.) An order based on a capacity to earn at that starting salary was easily affirmed. (*Id.* at pp. 1337–1339.) (Of course, the custodial parent didn't help her case any by flat out testifying that she would not take a full-time job in Los Angeles even if after-school childcare was available.) (*Id.* at p. 1338.) In the process, the appellate court stated that the payor parent "bore no burden to convince the court" that the custodial parent "*would have* secured a full-time [teaching] job had she applied." (*Id.* at p. 1339, original italics.)[14]

## C.  *What Meets, and What Doesn't Meet, the Burden*

A similar example of a moving party bearing its burden of showing ability and opportunity to earn at a reasonably exact salary range is to be found in *In re Marriage of Hinman, supra,* 55 Cal.App.4th 988, which the authoring court essentially treated as "*Hinman VIII.*" We will follow suit because the

---

[13] The payor parent had worked there himself for three years.

[14] The case of *In re Marriage of Paulin* (1996) 46 Cal.App.4th 1378 [54 Cal.Rptr.2d 314] superficially fits into the same category as *LaBass & Munsee* and *Hinman* (also known as "*Hinman VIII,*" as we discuss anon), since it similarly involved imputation to a custodial parent in modification proceedings brought by the payor parent. However, the court in *Paulin* had no occasion to address the question of who had a burden to do what, and whether that burden had been carried. (The word "burden" does not appear in the opinion except twice in the same footnote, both in the context of speaking of the existential "burden of child support." (See *id.* at p. 1384, fn. 5.)) There was no argument as to sufficiency of the evidence: The words "evidence," "sufficient," "insufficient" and "proof" are nowhere to be found in its text. The court never discussed the nature of the moving party's evidence; it only noted the trial court's rejection of the responding party's evidence. Thus, insofar as the questions of whether a burden existed, or was met are concerned, *Paulin* is not authority either way. (See *People v. Avila* (2006) 38 Cal.4th 491, 566 [43 Cal.Rptr.3d 1, 133 P.3d 1076], quoting *People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10 [17 Cal.Rptr.3d 302, 95 P.3d 523] [" 'It is axiomatic that cases are not authority for propositions not considered.' "].) What one *can* glean from *Paulin* (besides that which it is most cited for, namely that hardship deductions for a payor spouse's new (not-of-the-marriage) children may be available to alleviate the burden of a child support order) is that a caretaker's remarriage to a spouse affluent enough to allow him or her to quit working may be considered in a modification proceeding; in that regard one must remember that the apparent status quo going into the modification proceeding was one predicated on the fact that the caretaker parent worked part time as a nurse.

"VIII" emphasizes the contentious nature of the couple's relationship in the six years after their divorce, which was itself a factor in the order examined in the opinion.[15]

The status quo going into the hearing in *Hinman VIII* was that the custodial parent had been allowed to move out of state. The protracted postjudgment litigation of the previous six years had forced him into bankruptcy. And the enrollment of the eldest child in college had put a severe strain on his finances. However, by this time, the payor parent had quit her previous work in the insurance industry, and was busy raising three very young children from her subsequent marriage. In seeking modification, the custodial parent presented these facts: What the payor parent made in two jobs working for insurance companies ($44,000 at one company and $38,400 most recently at another company) (ability); a resume showing a degree in computer science and significant employment experience in the computer field (ability); two letters from employment agencies, one stating that she had an earning potential of between $35,000 and $45,000 and the other giving her earning potential at between $34,500 and $50,000 annually (opportunity, correlated with the income to be imputed); and letters from previous employers showing their satisfaction with her work (at least an inference of opportunity, i.e., that they would be happy to have her work for them again). (*Hinman VIII, supra,* 55 Cal.App.4th at p. 993.)[16]

Against that evidence, the payor parent pointed to the fact that she had (her own) three young children all under age three for whom she was the exclusive caregiver. She did not, however, dispute any of the basic facts involving her ability or opportunity to earn income. (*Hinman VIII, supra,* 55 Cal.App.4th at p. 993.) Accordingly, the trial judge made a support order based on earning capacity of about $38,000 a year (*id.* at p. 994 [imputing $3,200 per month]), which the appellate court readily affirmed.[17]

---

[15] See *Hinman VIII, supra,* 55 Cal.App.4th at page 992, footnote 3 (noting one published and six prior unpublished decisions).

[16] The *Hinman VIII* court also noted that the moving custodial parent presented correspondence with the payor parent's attorney requesting that she "contribute to the children's support," but a mere demand letter would, of course, show no ability nor opportunity to earn a given amount of imputed income. (*Hinman VIII, supra,* 55 Cal.App.4th at p. 993.)

[17] *Hinman VIII,* and *LaBass & Munsee,* touch on a more problematic area of imputation law, which is the impact of imputation on a caretaker parent (in *Hinman VIII* it was children from a new marriage, while in *LaBass & Munsee* it was the children from the marriage at issue). One can detect tensions in the judicial rhetoric concerning the issue. (Compare *Hinman VIII, supra,* 55 Cal.App.4th at p. 1000 [basically saying: Your problems are on your own head, and if the need to care for new children interferes with your obligation to pay support for the "supported" children, well tough] with *In re Marriage of Paulin, supra,* 46 Cal.App.4th at pp. 1382–1383

*In re Marriage of Wittgrove, supra,* 120 Cal.App.4th 1317, presents an important contrast with *Hinman VIII,* and with *LaBass & Munsee* (discussed above). In *Wittgrove,* both parents were doctors, but the mother (an ob-gyn) was not working at the time of the separation. She brought an initial OSC seeking child support. The father sought to have income imputed to her, but—other than putting into evidence the fact that she was indeed a doctor with a specialty in obstetrics and gynecology—presented no other evidence. The court dismissed the father's contention that the trial court was required to impute income to the mother: "Moreover, Alan's assertions that the child support guideline amount is wrong . . . because the court failed to properly impute additional income to Perri fails because he did not present any competent evidence that Perri had both an ability and an opportunity to earn the attributed income he sought to impute to her." (*In re Marriage of Wittgrove, supra,* 120 Cal.App.4th at p. 1329.)

### D.   *The Burden As It Plays Out Here*

We cannot stress too much that the trial court's (correct) decision in the present case is necessarily the result of highly unusual facts going into the combined modification proceedings, together with a minimalist trial litigation strategy on father's part. Put another way, being pennywise at trial may get you into difficulties that no amount of pounds (euros or dollars) spent on appeal will be able to cure.

As we have noted, the support order going in was zero-zero. Now, it was zero-zero precisely because both parents were working when the order was made, both parents made close to the same income when the order was made, and the "time share" was equal.

Let us be plain: The zero-zero support order effectively gave mother the chance to retire without risk of running the gauntlet of an OSC to modify support in light of that change of circumstances. We note specifically that, had there not been a zero-zero order, and mother retired and initiated a reduction of her share of support, the dynamics would have been different: Mother would have been in the more conventional situation of a payor parent who experiences a reduction in income and (as was the case in *In re Marriage of Leonard, supra,* 119 Cal.App.4th 546, *In re Marriage of Eggers, supra,* 131 Cal.App.4th 695, and *In re Marriage of Reynolds, supra,* 63 Cal.App.4th 1373) it would have been *her* burden to establish a lack of ability and opportunity to earn. That dynamic might have prompted her to think twice about retiring quite so early. In any event though, that is not what happened:

---

[suggesting that hardship deduction is appropriate way to handle problem of children from new marriage].)

In the case before us we might have had to deal with the issue if father had actually presented substantial evidence of ability and opportunity to earn a given salary, since mother here has two children from a new marriage. As we show below, father did not do so. Therefore there is no need to enter on the substance of the issue at this point.

Because of the highly unusual circumstances of this case (almost a lab experiment in the dynamics of burden of proof as they relate to imputation), the burden fell to father to show the presence of ability and opportunity.

■ Which the father *might* have done here, he just didn't. Conspicuously absent are the sorts of things that helped parents seeking imputation to carry their burden in *Hinman VIII*, and with *LaBass & Munsee*, e.g., the imputee's resume, want ads for persons with the credentials of the potential imputee, opinion testimony (e.g., from a professional job counselor) that a person with the imputee's credentials could readily secure a job with a given employer (or set of employers), or pay scales correlating ability and opportunity with the income to be imputed. Nor was there any vocational examination. What there was—merely the fact of retirement and previous income—was not sufficient, and thus the trial court's order denying imputation was clearly correct.[18]

---

[18] Apparently because of the lack of a vocational examination and the mother's willingness to undergo one, the trial court expressly made its order without prejudice. We express no opinion on any issue that might arise in subsequent proceedings in the wake of that aspect of the order.

In that regard, though, we should note that a very recent decision from another panel of this court, *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, brings the minimal evidence presented to the trial court in this case into sharp relief. Where the evidentiary facts in the case before us make up a thin consommé indeed, in *Mosley* they were, as in *Hinman VIII* and *LaBass & Munsee*, thick as lentil stew. *Mosley* was a case where a payor parent carried his burden of showing a change of circumstances (basically, he lost his job at a big law firm and got another as in-house counsel at much lower remuneration), though the trial court did not realize it at the time. Hence the *Mosley* court reversed the denial of the payor parent's request to have his child *and spousal* support obligations lowered. The payor parent had also, unsuccessfully, sought imputation of income to the custodial parent, who had been a big firm lawyer herself. Recognizing that the case would have to return to the trial court anyway, we "gave guidance" to the trial court (*Mosley*, at pp. 1389–1391), on a number of issues, including the imputation of income to the custodial parent. In that context we noted that the payor parent had provided both a vocational evaluation of the custodial parent and the testimony of a vocational expert as to what the custodial parent could earn. (Neither of which were provided to the trial judge in the case before us here.) We also noted two other factors: (1) The fact that the custodial parent was receiving spousal support and was under an obligation to become self-supporting; and (2) the benefits of the extra time the *payor* parent would have to spend with his children if he weren't required to "spend as much time at work trying to maximize his bonus" and thus could "spend more time with the children himself." (*Id.* at p. 1390.) Here, by contrast, mother had no independent obligation as part of a spousal support order to become self-supporting and father did not present any argument, much less evidence, that imputation to mother would have a beneficial effect on the amount of *his own* time spent with his two boys.

## IV. Miscellaneous Comment of the Trial Judge:
### *"Padilla* Jail"

The father also asserts that a miscellaneous comment by the trial judge somehow constitutes grounds for automatic reversal. The argument is not persuasive.

Specifically, as a wholly passing comment made toward the end of the brief hearing, the trial judge asked, rhetorically, "when do you get out of *'Padilla* jail?' "[19] The father here asserts that the comment evidenced a prejudicial "mistaken premise" that led to the court's decision not to impute income to the mother.

There are two answers to the assertion. The first is: No, the comment was not evidence of proceeding on the wrong premises. The trial court correctly divined that the father simply had not produced enough evidence on which to base imputation.

The second is: The comment was, in context, nothing more than a metaphor for the trial court's rejection—and we think a correct rejection—of an overly rigid reading of *Padilla.* That is, the trial court did not understand this court's opinion in *Padilla* as standing for the Dickensian proposition that a payor parent can *never* do anything that reduces income without a requirement that income be imputed; "jail" was simply a figure of speech to underscore that overly rigid and incorrect reading.

A few words on *Padilla* are now in order. There can be no doubt that the *Padilla* decision was correct under its particular facts: The payor parent could not, "within weeks" of a court hearing in which his income was at issue, quit a "well-paying job" held "for many years"—in the process reneging on a previous agreement to pay support at the new levels—and then, six months later, when the business had not been as successful as hoped for, expect his

---

[19] The trial judge had just told the father's counsel that not enough evidence had been adduced on the mother's ability to earn what she had earned before. The father's counsel then asked to be "heard on that." The judge immediately segued: "I know the *Padilla* case. We all know the *Padilla* case. [¶] But at what time do you get out of *Padilla* jail? You made a decision before there was an—an argument between these people. She decided she was going to take an early retirement. I'll order her to go back to work, or impute the income for whatever she has the ability to earn when she goes back to work. But I don't think *Padilla* meant that the child support orders and the imputation [of] income was intended to be a punishment"—at which point the father's counsel interjected, "I'm not asking"—and the trial judge stated, "—or a penalty for making a poor decision. [¶] And we struggled with that over the years. I understand the *Padilla*—maybe this will be the case for the Court of Appeal where they will address that—but when somebody decides to retire and can't get the job back, for the rest of their life? Do we impute until she's 65?"

income not to be calculated at prebusiness startup levels. (See *In re Marriage of Padilla, supra*, 38 Cal.App.4th at pp. 1215, 1219.) The quitting of a well-paying job so soon before a hearing where an obligation is to be determined based on income simply does not stand the smell test.

To be sure, there is some language in the *Padilla* opinion that might be described as exuberant dicta, and that dicta can be, if read superficially, taken for a rigidity that transcends the *discretion* the Legislature wrote into the text of Family Code section 4058, subdivision (b). At one point, for example, the opinion indicates that "A parent's motivation for reducing available income is irrelevant when the ability and opportunity to adequately and reasonably provide for the child are present." (*In re Marriage of Padilla, supra*, 38 Cal.App.4th at p. 1218.) Perhaps there is some reasonable wriggle room in the words "adequately . . . reasonably provide" in that sentence, but the sentence may be too easily taken for the blanket proposition that motivation is *per se* irrelevant. An inflexible rule of per se irrelevance, however, is inconsistent with Family Code section 4058, subdivision (b)'s treatment of earning capacity as a discretionary matter considering the best interests of the children. There may be times, however, when the "best interests of the children" are *promoted* when parents leave stressful, time-consuming, albeit high-paying jobs, so as to be able to spend more time with their children. The case of *In re Marriage of Everett* (1990) 220 Cal.App.3d 846 [269 Cal.Rptr. 917] is particularly instructive in that regard.

In *Everett*, the payor parent had worked at a supermarket as a bakery manager, then salesperson, then lost his job "shortly before separation due in part to drinking problems." (*In re Marriage of Everett, supra*, 220 Cal.App.3d at p. 851.) He then started working at a small bakery and married the proprietor, and tried to make a go of things with his new wife—which was difficult when the business lost a major account and tottered near bankruptcy. (*Id.* at p. 858.) But at least the job stresses were less, which was of some importance given his condition as a recovering alcoholic (nothing to drink in the previous six years). (*Ibid.*) When the payor parent moved to modify visitation, though, his ex-wife requested a wage assignment, and he responded with a request for modification of support. At the hearing the trial court based its order "solely on earned income" and not on earning capacity based on his work as a "skilled baker." (*Id.* at pp. 856, 858.)

The *Everett* court upheld the decision not to impute income as against the ex-wife's claim on appeal that the court abused its discretion in not doing so. The court noted that the payor parent (a) was working "full time on a continuous basis since the marital dissolution" and (b) there was no evidence of "shirking" and reasoned that just because the payor parent was employed in a "*different setting*" (*Everett, supra*, 220 Cal.App.3d at p. 861, original

italics) was no basis for imputation. In doing so, the appellate court actually seemed to acknowledge the *legitimacy* of the payor parent's desire to work in a *less stressful* job. Said the *Everett* court in a remarkably sensitive passage: "The trial court's task is more delicate than simply deciding that because a parent might be able to earn more money, additional income should be imputed to that parent . . . . [¶] . . . Maybe the restructuring would not work out and the parent's financial situation and mental well-being would deteriorate. All of these factors are interrelated; while ultimately the court must consider earning capacity to the extent consistent with the best interests of the children, their best interest of course is *affected by the economic as well as emotional strength of the supporting parent.*" (*Id.* at p. 862, italics added.)

We need only add that, of all people, *judges* should be the first to recognize the validity of good faith decisions to trade, as our Supreme Court put it in *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234–235 [14 Cal.Rptr.2d 411, 841 P.2d 931], "an extraordinary work regimen" for an "objectively reasonable work regimen." (In *Simpson*, the high court upheld the trial court's decision *not* to impute earning capacity based on a history of working overtime.) Most (all?) judges, after all, would make more money if they returned to private practice, but the phrase "extraordinary work regime" does not even begin to describe the often typical 2,200 (or is it 22,000 these days?) billable hours a year that might be required. And indeed, the *Padilla* opinion itself correctly intuited that point. (See *In re Marriage of Padilla, supra,* 38 Cal.App.4th at p. 1220, fn. 7.)

In that regard, the most exuberant dicta in *Padilla*, though, was in the opinion's penultimate paragraph.[20] Language in that paragraph might easily be taken for the proposition that parents may *never* try to change their circumstances so as to "lead a simpler life," "change professions," or— perhaps the *Padilla* court was making an allusion to California's reputation for being a New Age lotusland—seek "self-realization" or "self-fulfillment," unless they are prepared to pay child support based on theoretical income based upon a previous earnings level. That dicta was simply too broad: It confused the legitimate attempt to attain some balance in one's life and maybe even actually spend some *time* with one's children with self-indulgent shirking. As noted above, the discretionary and best interest elements in

---

[20] For reader convenience we quote that dicta here: "Statutory commands and the inherent responsibility parents owe their children lead us to conclude the bad faith rule, as applied to child support, if not ill conceived in the first instance, can no longer be supported. Once persons become parents, their desires for self-realization, self-fulfillment, personal job satisfaction, and other commendable goals must be considered in context of their responsibilities to provide for their children's reasonable needs. If they decide they wish to lead a simpler life, change professions or start a business, they may do so, but only when they satisfy their primary responsibility: providing for the adequate and reasonable needs of their children." (*In re Marriage of Padilla, supra,* 38 Cal.App.4th at p. 1220, fn. omitted.)

Family Code section 4058, subdivision (b) certainly temper any such proposition. Indeed, to the degree that the "self-realization" dicta from *Padilla* can be read as standing for an inflexible income-ratchet rule (a payor parent can never change positions without having child support calculated on the last and highest income level) we think, on reconsideration, that such a rule is in conflict with the test of earning capacity announced by our Supreme Court in *In re Marriage of Simpson, supra,* 4 Cal.4th 225, 234–235[21] as well as our First District colleagues' decision in *Everett.* Both decisions, we think, correctly perceived that the discretion inherent in Family Code section 4058 is not a one-way street requiring a squeeze-the-last-drop workaholism from either parent. (One should remember in this regard that a number of the cases, including *LaBass & Munsee* and *Paulin* involved the imputation of earning capacity directed at the stay-at-home caretaker parent.) We have every confidence that trial judges can sniff out shirking and efforts to skirt legitimate obligations well enough that a per se "last and highest income rule" is not only contrary to statute, but unwise and unnecessary as well.

## V.  Disposition

The court's order is affirmed. However, in light of the unusual circumstances of this case, where the parent with the greater custody has ended up paying the parent with the lesser custody, we believe that the interests of justice require that each side bear its own costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.

**RYLAARSDAM, J.,** Concurring.—I concur.

But because I was a member of the panel that decided *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212 [45 Cal.Rptr.2d 555], I need to explain my willingness to accept the criticism of that case contained in our opinion.

There is some benefit to be derived from experience and one thing I have learned during my 13 years on the court is the danger posed by categorical statements in judicial opinions. It is our job to decide cases. No more, no less. The statements we made in *Padilla* criticized in our opinion went beyond that mandate.

---

[21] The precise language is: "We conclude that earning capacity generally should not be based upon an extraordinary work regimen, but instead upon an objectively reasonable work regimen as it would exist at the time the determination of support is made." (*In re Marriage of Simpson, supra,* 4 Cal.4th at pp. 234–235.)

I am still of the opinion that the parents' duty to support their children is a paramount duty. But this does not mean there never are circumstances where other considerations may also come into play. A most obvious example is where a parent must weigh a reduced income against a need to spend more time with his or her family. Ultimately it is the job of the trial court to weigh all the needs of the children, not only their economic needs, against the ability of the parents to fill these needs.

A petition for a rehearing was denied August 22, 2008, and the opinion was modified to read as printed above.