[No. D006633. Fourth Dist., Div. One. Sept 13, 1988.]

In re the Marriage of BETTY M. and GEORGE H. SINKS, JR.
BETTY M. SINKS, Respondent, v.
GEORGE H. SINKS, JR., Appellant.

COUNSEL

Shea & Ashworth, Michael C. Shea, Gregory D. Larson and Frances L. Harrison for Appellant.

Lightner & Castro and John Lightner for Respondent.

## OPINION

**TODD, J.**—George H. Sinks, Jr., appeals an order denying his motion to reduce or terminate spousal support. The motion was based on the premise that George's early retirement (at the age of 62) constituted a change in circumstance justifying either a reduction or termination of support. We conclude the trial court found George's retirement was motivated by his desire to avoid paying spousal support, and, therefore, the refusal to terminate support was not an abuse of discretion.

### FACTS

*Background[1]*

George H. and Betty M. Sinks separated in July 1980 after nearly 30 years of marriage. At the time of separation, one minor child (16 years old) resided at home. George was a personnel manager for a division of Merck & Company; Betty was an unemployed homemaker who had worked at a church school which paid her $368.79 per month. After a trial in July 1981, the interlocutory judgment of dissolution was entered on August 28, 1981. Among other things, the judgment provided that George pay Betty spousal support of $900 per month for two years, beginning August 1, 1981, and, thereafter, each year the monthly payment would be reduced by $100 until the support was $500 per month, where it was to remain "until further order of the Court." The judgment also provided that Betty would have exclusive right of possession of the family residence for two years or until she remarried, whichever event occurred first, and that thereafter the property would be sold, with the proceeds divided equally between the parties. The court was to retain jurisdiction until the property was sold. The court also retained jurisdiction to divide the benefits of the Merck & Company employees' retirement plan. (Final judgment of dissolution of marriage was entered March 16, 1982.)

On December 29, 1983, George filed an order to show cause seeking an order (1) regarding sale of real property (family residence) and (2) terminating or modifying spousal support, which at that time was $800 per month. (George said Betty was no longer unemployed and also raised the allegation Betty was receiving significant financial assistance from and/or living with another man.) In response, Betty sought certain orders, including modification of spousal support. In her income and expense declaration filed

---

[1] The factual material in this part of the opinion is taken in part from portions of the trial court file not included in the record on appeal. We judicially notice these documents pursuant to Evidence Code sections 452 and 459.

February 10, 1984, Betty reported she received $414 in monthly salary and wages. (In an accompanying declaration, she said she had a part-time job with a day care center and was attending night classes to learn how to become a travel agent.) On February 21, 1984, the trial court, among other things, ordered George to pay Betty spousal support of $875 per month, beginning March 1, 1984, and continuing until further order of the court.

On October 3, 1985, George filed an order to show cause seeking termination or modification of spousal support. He cited Betty's employment as a trained travel agent and again raised the allegation that she was cohabitating with another man. In response, Betty filed an income and expense declaration in which she listed income of $9,500 for the previous 12 months from her job as a travel agent ($791.66 per month). However, she stated she was currently unemployed (as of September 1985). In an accompanying declaration, she stated the travel agency she worked for had gone out of business. Meanwhile, the family residence was sold with escrow scheduled to close on November 25, 1985. Betty estimated her monthly rent at $750, whereas her monthly mortgage payments had been $185. After an April 11, 1986, hearing, the trial court ruled the support would remain at $875 per month. In its written order filed September 2, 1986, the court also found (1) there was no cohabitation at this time and (2) George "has made greater economic strides since the last prior support hearing than has [Betty]."

### Order Before This Court

On April 1, 1987, George, then 62 years old, retired from Merck & Company. At age 62, George was eligible to receive a full pension with no reduction in benefits. On April 6, 1987, Merck & Company filed an application for an order in which it asked the court to divide George's retirement plan benefits between George and Betty. The court determined Betty's interest in the retirement to be 29.1 percent or approximately $240 per month. In response to Merck's application, George, citing his retirement as a change in circumstance, again sought modification of his spousal support obligation. Betty responded she would consent to a reduction in support by the amount she received from the pension.

On June 5, 1987, the court denied George's request for modification and ordered support be continued at the previously ordered amount of $875 per month. At the time of the June 5 hearing, George reported that as a result of his retirement his income had decreased from $4,300 per month in salary to $565 per month in pension benefits (his $816 share of the pension minus Betty's share of $241. The math is off $10). George also said when he combines all other sources of income (dividends, interest) his monthly income is $966. (George's income and expense declaration filed April 28,

1987, differs a little; it states his gross monthly income is $1,267, which, if you subtract Betty's $241, leaves a total of $1,026.) He reported monthly deductions of $246, leaving a monthly disposable income of $1,021. He also reported monthly expenses of $1,555.

Betty's income and expense declaration, filed May 28, 1987, reported a net monthly disposable income of $538.61. She reported she had worked as a travel agent for the past five months, earning an average of $386.50 per month. Betty reported monthly expenses of $2,177.45.

In a supplemental declaration filed June 4, 1987, George said he retired because his supervisor had expressed dissatisfaction with his work performance and had threatened to fire him. He said he did not consider his retirement "totally voluntarily" [sic] but rather a decision to retire "rather than waiting until I was terminated."

The court found George's net income was described in his income and expense declaration minus the $241 in Betty's retirement benefits for an actual net monthly income of $780. The court found Betty had $241 per month retirement income, $560 per month net income from other sources, plus interest on a declining capital base. The interest appears to be income of $83 per month for a total net monthly income of $884.

The trial court did not issue findings of fact. It did, however, state the following reasons for its decision on the record: "There is a reality which cannot be denied, maybe it will be improved upon, that persons who stay in the home, and we are almost always talking about women, and begin their employment after a great many years as a homemaker, cannot command the salary, can't even begin to command the salary that people who have . . . been out for a long time earn.

"On top of that, the salary paid to women is much less than the salary paid to men for comparative work.

"That's enough said of that side of the case. The other side of the case is that Mr. Sinks has been employed, so far as I can tell, throughout his adult life, provided for his family. The parties separated and the support is set. . . .

"He now chooses to retire at the age of 62. And, of course, it has a tremendous effect upon his income. If I understand correctly, Mr. Sinks had an income, a gross income of over $4,000 a month, and a net of approximately $3,000 per month when the [$]875 was ordered.

"Ms. Sinks has improved her income. And it is now, it has been as high as [$]600 net, and it is now somewhere around [$]560, somewhere around [$]540 to [$]570. Ms. Sinks also has the portion of the retirement which is $241. And she has the interest that she can take off what will be a declining asset, which is her share of the community property that was divided between the parties.

"Mr. Sinks is residing with a person who is able to provide and meet some of his expenses. So far as this court can tell, Ms. Sinks is not.

"Mr. Sinks made a knowing decision to retire when spousal support was $875. Perhaps through advice of counsel, or maybe on his own, he apparently believed that the support would be reduced.

"Mr. Shea [George's counsel] says this is not a Philbin case. It isn't, but it is similar.

"Mr. Sinks is able-bodied. There has been no reference to any problems regarding health. There maybe [*sic*] a dispute at his employment. It is a big company. There are other employers. . . ."

## DISCUSSION

George's major contention on appeal is that the trial court abused its discretion in maintaining the spousal support at $875 per month by improperly imposing an "ability to earn" standard rather than relying on George's "actual income."

We start with certain well-settled general rules regarding modification of spousal support:

First, the trial court has broad discretion in deciding whether to modify or revoke a spousal support order. (*In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 633 [120 Cal.Rptr. 654].) A trial court's exercise of its discretion will not be disturbed on appeal unless as a matter of law an abuse of discretion has been demonstrated. (*Philbin v. Philbin* (1971) 19 Cal.App.3d 115, 119 [96 Cal.Rptr. 408].) An abuse of discretion occurs when, after calm and careful reflection upon the entire matter, it can fairly be said that no judge would reasonably make the same order under the same circumstances. (*In re Marriage of Bukaty* (1986) 180 Cal.App.3d 143, 147 [225 Cal.Rptr. 492].)[2]

---

[2] With respect to one aspect of the trial court's refusal to modify the support order, we find a per se abuse of discretion. No one disputes that Betty's income has been increased by $241 per month. Betty even consented to a modification reflecting that increase. Accordingly, we

■ Second, an order for spousal support must be based on the facts and circumstances existing at the time the order is made. (*Philbin* v. *Philbin, supra,* 19 Cal.App.3d at p. 122.) " ' "[T]he power to make such orders must be held to be limited to the conditions and circumstances existing at the time they are made." ' " (*In re Marriage of Kuppinger, supra,* 48 Cal.App.3d at p. 639.)

■ Third, a modification of a spousal support award may be made only on a showing of a material change in circumstances subsequent to the last prior order. (*In re Marriage of Kuppinger, supra,* 48 Cal.App.3d at p. 633.) It follows a modification order must be based on current facts and circumstances.

■ In refusing to terminate or modify the existing support order, the trial court here applied an ability to earn standard rather than an actual income standard. The key issue before us thus becomes: Was this error? The general rule is the court should consider current earnings in setting support. (*Philbin* v. *Philbin, supra,* 19 Cal.App.3d at p. 121.) But this cannot be considered the final word on the subject. In certain situations, the trial court may set support or base a modification of support on the payor's ability to earn rather than on the payor's current income. (*Meagher* v. *Meagher* (1961) 190 Cal.App.2d 62, 64 [11 Cal.Rptr. 650].)

In *Meagher,* before applying the ability to earn standard, the court considered the husband's own voluntary course of conduct in reducing his apparent ability to meet his financial family responsibilities. The husband had quit a well-paying job in a family-owned corporation immediately after the separation of the parties for a much lower paying job. The Court of Appeal, per Justice Tobriner, stated: "He apparently terminated his favorable association with that corporation at the very time he deserted his family and sought to shed his family responsibilities. In view of those facts the trial court could properly conclude that the 'potential of this man' and his apparent 'substantial interest' in the family corporation indicated his ability to meet the awarded payments. The court could evaluate the peculiar coincidence of salary reduction in the family-owned firm and the marital separation." (*Meagher* v. *Meagher, supra,* 190 Cal.App.2d at pp. 63-64.)

The *Philbin* court recognized the propriety of using the ability to earn standard when a spouse intentionally tries to avoid his or her family responsibilities: "While it is true that an award of alimony and child support may be based upon the husband's ability to earn as distinguished from his actual

---

find the trial court should have, in the proper exercise of its discretion, reduced the support level by $241 per month. Otherwise, Betty will receive a $241 per month windfall at the expense of George.

income, the rule seems to be applied only when it appears from the record that there is a deliberate attempt on the part of the husband to avoid his financial family responsibilities by refusing to seek or accept gainful employment [citations]." (*Philbin* v. *Philbin, supra,* 19 Cal.App.3d at p. 121.)

In *Philbin,* the husband was an entertainer whose gross annual income was $55,000 when the property settlement was executed, $95,000 when the interlocutory and final judgments were entered, but only $27,000 the following year when he sought a modification of the support order. The fluctuations resulted from the undisputed circumstances that one year the husband was under a national television contract, which was extremely lucrative, while another year, he was under an exclusive local television contract, which included relatively small remuneration. The Court of Appeal upheld the trial court's reduction of support by noting that the husband's "financial situation is limited by the very nature of the business by which he earns his living; few in the entertainment field, with the exception of those with star status, are able to sustain high incomes. It cannot be said that [the husband] has done anything to depress his income or has deliberately left one employment to go into another; the record shows that the unavailability of television employment out of Los Angeles is the direct result of his work under a contract that guarantees him $2,000 monthly gross income during its term." (19 Cal.App.3d at p. 121.)

Even though the *Philbin* court found the case was not one in which the payor seeking modification had deliberately attempted to shirk his or her responsibilities by deflating his income, the moniker of *"Philbin* case" has ever since been attached to cases involving such improper motive:[3]

George contends his voluntary retirement at the age of 62 was not a *Philbin* situation, and he relies in part on the trial court's statement: "Mr. Shea [George's counsel] says this is not a Philbin case. It isn't, but it is similar." George therefore argues in his opening brief that the trial court did not find George's retirement was behavior designed to avoid his financial responsibilities to Betty.

However, this argument ignores what the trial court said immediately preceding and following its statement about the *"Philbin* case." In very unambiguous terms, the trial court stated: "Mr. Sinks made a knowing decision to retire when spousal support was $875. Perhaps through advice of counsel, or maybe on his own, he apparently believed that the support

---

[3] In *In re Marriage of Williams* (1984) 155 Cal.App.3d 57, 62 [202 Cal.Rptr. 10], the court emphasized the improper motive for applying the ability to earn standard under *Philbin, supra*: "The standard is not imposed unless there is some conduct by the supporting spouse indicating deliberate behavior designed to avoid his financial responsibilities to his [family]."

would be reduced." These two sentences were followed by the trial court's remarks regarding *Philbin*. Then the trial court observed: "Mr. Sinks is able-bodied. There has been no reference to any problems regarding health. There maybe [*sic*] a dispute at his employment. It is a big company. There are other employers."

We agree with Betty that a reasonable inference to be drawn from these comments is that the trial court concluded George retired to avoid having to pay $875 in spousal support. Any ambiguity in the trial court's statements regarding *Philbin* is de minimis and stems from the fact that the moniker *"Philbin* case," which commonly refers to a situation in which a supporting spouse deliberately attempts to avoid his or her support responsibilities, is derived from a case in which the court found the supporting spouse did not have such a motive. Since the trial court found George's motive in retiring was to end his financial family responsibilities, we conclude it was not an abuse of discretion to apply the ability to earn standard.

As the trial court noted, George is able-bodied and appears to have the ability to secure employment elsewhere. His claim that he is being forced to relinquish his right to retire at age 62 from Merck & Company with full pension rights misses the point. The trial court found his voluntary retirement was an attempt to shirk his support obligation. The trial court's order does not prevent his retirement or his enjoyment of his pension rights at the age of 62. Because the law does not sanction the shirking of familial responsibilities, George, having chosen to retire at age 62 for improper motives, has the option of finding work elsewhere or using his separate property to meet his support responsibility.[4]

If the circumstances here were different and the motivation behind the retirement were not suspect, the case would raise an issue of first impression in this state: Is a supporting spouse, who is eligible for retirement, obligated to continue working to provide spousal support? George raises a number of policy arguments regarding the right of a supporting spouse to enjoy a bona fide retirement that we need not consider in light of our conclusion that the court properly found the retirement was improperly motivated before applying the ability to earn standard.

Certainly, we recognize the bona fide retirement of a supporting spouse warrants an examination by the trial court to determine if there has been a material change of circumstances to justify a modification in support. (See *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 91, fn. 14 [154 Cal.Rptr. 413,

---

[4]In his reply brief, George concedes the following: "George could be required either to go to work or invade his capital assets for BETTY'S support *if* the court had found that GEORGE had retired for the purpose of avoiding his family financial responsibilities."

592 P.2d 1165].) Nor are we precluding George from going before the trial court at some future date to seek a modification and/or termination of the support obligation. For example, situations which come to mind include a material change in Betty's circumstances, or George being able to present evidence of his good faith attempts to secure other employment.

## DISPOSITION

The trial court is directed to modify its order by reducing Betty's support by $241 per month and undertake appropriate measures to effectuate such modification. In all other respects, the order is affirmed.

Kremer, P. J., concurred.

**WORK, J.,** Dissenting.—There are retirements, and then there are retirements. Some forced, some voluntary at the time the number of years of employment coalesces with the employee's requisite age, and others which are offered to induce employees to retire early for the economic benefit of the employer. George is in the latter category, one which has been utilized with more and more frequency in the past decade as major employers faced with increasing pressures of international competition seek to maintain or increase profit margins.

When the parties here were divorced in 1981, it is likely neither they nor the court assumed George would opt to retire before completing 20 years service, an event which would occur the same year he would reach the generally accepted retirement age of 65. Indeed, the retirement plan utilized by George was not enacted by his employer until 1986. It, in effect, enhanced the retirement benefit by crediting George with an additional three years service should he retire at age 62. Thus, suddenly George was in a position to immediately retire with the same benefits he would otherwise have to work another three years to receive, an offer he apparently was emotionally unable to refuse. In addition, he was able to cash in approximately $55,000 of separate property retirement benefits he had invested in his employer's company. George states he is placing this money at interest for living expenses. The adequacy of this sum is apparent from George's election to take an additional $70,000 from cash in hand and apply it toward the purchase of a residence.

On the other hand, George's decision has a significant detrimental impact on Betty's ability to receive meaningful spousal support even though her separate property interest in the retirement fund is increased by a negligible amount. Her percentage was set at one-half of ten years divided by the number of years George worked times the amount of the total monthly

retirement payment. Had George actually worked 20 years to get the same total sum, Betty's share would be only 25 percent. Here, she gets 29.1 percent. The downside is, for a period of at least three years, she has an ex-husband whose income has been substantially reduced.

In one sense, neither party generates confidence from a reviewing court. The opposing declarations contain unsupported accusations of the other's conduct with charges that each is hiding assets and living lifestyles with third parties which belie their purported financial distress. There is no showing the allegations are supported by evidence to the trial court or that they influenced its decision.

There is simply no substantial evidence that George accepted early retirement for the purpose of shirking his responsibilities to his ex-wife, the finding referred to in *Philbin* v. *Philbin* (1971) 19 Cal.App.3d 115 [96 Cal.Rptr. 408] and in *In re Marriage of Williams* (1984) 155 Cal.App.3d 57 [202 Cal.Rptr. 10] as triggering use of the "ability to earn" standard. Further, the trial court made no such express finding, nor does the trial court's comments on George's awareness that his income would plummet when he retired and that his health appeared sound, reasonably support such a finding by implication. Unlike the majority, I do not find facts in this record rendering George's motivation in retiring "suspect," at least in the context it is employed, i.e., an intent to deprive Betty of support.

Even so, I agree the circumstances as presented on this record do not necessitate our addressing the significant hypothetical issue posited regarding whether persons eligible for age or service retirements can be forced to continue working solely because their ex-spouse's support needs cannot otherwise be met. The issue is important and complex, but the defect in the present case is only that the trial court did not exercise discretion based on George's actual ability to pay, a consideration requiring an evaluation not only of income but of separate property assets. (See Civ. Code, § 4801, subd. (a)(3).) For instance, when George took early retirement he was not only free to "vacation" early, he also freed more than $50,000 in retirement benefits and was able to shunt some $70,000 of potentially income-producing capital into a real property nonincome-producing home. That George's income needs are such that he can elect to forgo maximizing his current income in favor of a long-time investment in a home suggests there are several relevant factors for the court to evaluate.[1] Thus, I would reverse the

---

[1] We note also George lists a monthly rental for a mobile home space but lists no mobile home as an asset nor explains why he is making monthly payments both on a home and a mobile home space.

order of spousal support insofar as it denies modification and remand to the trial court for further findings in which the personal assets of each party are evaluated in conjunction with other relevant factors.