Filed 2/28/13  Truong v. Truong CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DANG NGUYEN TRUONG, | |
| Plaintiff and Respondent, | G046555 |
| v. | (Super. Ct. No. 30-2010-00344972) |
| THINH TRUONG et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge.  Affirmed.

O'Rourke, Fong & Manoukian, and Marina Manoukian, for Defendants and Appellants.

Law Office of John Derrick, and John Derrick, for Plaintiff and Respondent.

\*          \*          \*

Thinh Truong, VietEagle, and VietEagle Seafoods (collectively Thinh)[1] appeal from a judgment in a bench trial in favor of Dang Nguyen Truong for $116,000 on contract causes of action. Thinh contends the trial court erred by allowing Dang to amend his complaint to add the contract causes of action to conform to the proof at trial. Thinh also challenges the sufficiency of the evidence to support the judgment in Dang's favor. For the reasons discussed below, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Business Dispute*

Dang and Thinh, who are first cousins, formed VietEagle Seafoods (VietEagle) in 2004 to import seafood from Vietnam. Because of his graduate degree in business administration, Dang's duties at VietEagle included setting up the business, bookkeeping, deliveries, and inventory control. The cousins agreed Dang would advance all start-up costs and be reimbursed once the business developed a positive cash flow.

Thinh's business duties centered on VietEagle's seafood products because he had a 30-year relationship with a seafood exporter in Vietnam named Thanh Quang Nguyen. Thinh and Thanh had been classmates and neighbors in Vietnam, and the two were like brothers, while Dang only knew Thanh through Thinh. In March 2006, Thanh visited Thinh and Dang in the United States to discuss expanding his seafood factory in Vietnam. In June 2006, Dang paid Thanh a return visit in Vietnam, and agreed to lend Thanh $100,000 at 8 percent interest per year. Dang obtained the funds using his home equity line of credit.

---

[1]    Because the parties and an important nonparty share the same last or middle names, and the trial court and counsel used their first names for ease of reference in the trial below, we do the same on appeal and intend no disrespect.

Dang and Thinh agreed the loan would benefit VietEagle through access to Thanh's increased seafood production, but the pair also agreed Dang's loan to Thanh was personal in nature and not a VietEagle liability. Nevertheless, because Dang and his wife were in Vietnam and Dang's bank required a customer wiring funds internationally to be physically present, Dang remotely transferred $100,000 to the VietEagle business account and Thinh wired that sum to Thanh in Vietnam.

Dang and Thinh soon parted ways over Thinh's dissatisfaction with Dang's poor accounting management. Thinh continued to request additional accounting records after Dang left VietEagle in November 2007, but Dang responded he already had turned over everything he possessed.

Not long after this accounting dispute, Thinh and Thanh discussed transferring Thanh's loan repayment obligation to Thinh and VietEagle, or otherwise facilitating Thanh's loan repayment. Ultimately, Thanh agreed to send seafood exports to Thinh and VietEagle, but rather than pay Thanh for the seafood, Thinh would pay Dang the principal and interest Thanh owed Dang. Thinh viewed the arrangement as leverage to extract more information from Dang in their accounting dispute.

Dang did not know of Thinh and Thanh's arrangement until Thinh asked Dang in an August 2008 e-mail for more financial documents regarding VietEagle. By the time Thinh told Dang about the arrangement, Thinh had received the entire loan amount from Thanh in the form of product credits.

In February 2009, Dang met Thanh in Vietnam, inquired about the loan, and Thanh told Dang he had paid the money to Thinh to repay Dang, with interest exceeding 8 percent. In March 2009, Dang e-mailed Thinh that he knew Thinh and Thanh settled the $100,000 loan, that Thinh could deduct whatever money he thought

3

Dang owed VietEagle from the loan repayment, and that it was urgent Thinh respond because Dang was going to lose his home to foreclosure. Thinh did not reply.

Dang grew hopeful in May 2009 when he learned from his father that Thinh wanted to meet to resolve the matter. Dang again e-mailed Thinh, and this time Thinh responded, instructing Dang to bring various financial documents when they met. Dang replied he no longer had the documents and that a mutual cousin named Ahn Ba was holding onto them. Thinh and Dang agreed to meet at Thinh's office in mid-May, but when Dang arrived he found Thinh's office closed for the day and Thinh did not answer his phone.

Over the course of that summer, Dang corresponded with Thinh and sent him various financial records, but Thinh remained dissatisfied. In late September 2009, Thinh's secretary e-mailed Thanh to complain Dang failed to resolve the remaining accounting issues with VietEagle, and therefore Thinh did not intend to repay Dang's loan as they had agreed in 2008. But three days later, in early October 2009, Thinh finally met with Dang, who was accompanied by his wife and father, and informed Dang he would release Thanh's funds if he (Thinh) and Dang resolved their accounting issue to Thinh's satisfaction. Thinh admitted he had received and still possessed the loan reimbursement from Thanh, but emphasized he would not release the money until they settled the accounting issue. Dang explained he was in financial trouble and suggested Thinh repay part of the loan until the two could settle the disputed amount. Thinh refused, and Dang and his wife subsequently lost their home to foreclosure in 2010.

In the meantime, however, Dang's wife e-mailed both Thinh and Thanh in late October to seek a resolution. Thanh replied he had paid off the loan by paying Thinh and VietEagle, and he insisted he should no longer be bothered about the matter. Thinh

4

reaffirmed to Dang's wife that he would not release the funds until he and Dang settled their accounting differences.  Dang and Thinh met again in mid-November 2009 and, after reviewing their accounting dispute, including how much money Dang had put into VietEagle and how much he had taken out, the pair agreed that Dang owed VietEagle $8,000.  Still, Thinh hedged that he would not accept this figure until he could verify certain transactions, and Thinh rose from his seat to leave the meeting.  Dang implored Thinh to discuss repayment of the loan, but Thinh dismissed Dang saying he would meet Dang the next day at the bank to deal with it.  Thinh did not appear at the bank and never repaid Dang.  Instead, in December 2009, Thinh sent two payments to Thanh's company totaling $116,000, corresponding exactly to the amount owed to Dang at 8 percent interest.

B.    *The Trial*

Dang filed suit against Thinh and VietEagle to recover the $116,000 on theories of conversion, fraud, and breach of fiduciary duty, and he also alleged Thinh defamed him.  Thinh filed a cross-complaint alleging causes of action for breach of contract, fraud, conversion, and intentional interference with economic relations based on Dang's accounting work for VietEagle, and Thinh also alleged Dang defamed him.

In a bench trial lasting several days, the trial court found Dang owed Thinh $33,324.37 under a conversion theory for his accounting missteps, but rejected the rest of Thinh's allegations.  Dang does not appeal the $33,324.37 judgment in Thinh's favor.

At the close of evidence, the trial court expressed skepticism that Dang's tort claims fit any of the facts litigated at trial.  The court noted the facts alleged in Dang's complaint appeared consistent with contract claims instead of tort claims, specifically breach of a suretyship agreement, breach of contract under a third party

5

beneficiary theory, and promissory estoppel. The trial court invited Dang to file a motion to amend his complaint to conform to the proof presented at trial, and asked each side to submit briefs on these new issues within two weeks. The trial court also allowed the parties another week to respond to new briefing.

After reviewing the party's submissions and hearing further argument, the trial court granted Dang's motion to amend his complaint to conform to the proof at trial, adding the suretyship, third party beneficiary, and promissory estoppel causes of action. The court concluded the amendment did not "unfair[ly] surprise or prejudice [the] defendant" because the underlying facts remained "virtually identical" and Dang had "discussed breach of contract theory in his trial brief."

Ruling on the merits, the trial court found for Dang on all three contract-based causes of action and entered judgment in the amount of $116,000, plus $7,776 in costs, for a total of $123,776. The court made a factual finding that "Thinh lied about virtually every point that supported his position. His falsehoods were palpable." Similarly, the court observed Thinh "was just hopelessly either contradictory in his statements or his explanations strained credulity to the limits even with the assistance of [his lawyer]. I [recorded] several times in my notes how desperately she's leading him to try to say something that makes sense. He just couldn't do it. And that's why in terms of virtually all of the testimony that comes to a dispute between what Mr. Dang says and what Mr. Thinh says, I will choose to believe Mr. Dang." Thinh now appeals.

## II

## DISCUSSION

A.    *Issues and Standard of Review*

Thinh contends the trial court erred by allowing Dang to amend his complaint to conform to the proof at trial. A trial court may allow amendment of a pleading at any time up to and including trial. (Code Civ. Proc., §§ 576, 473, subd. (a)(1).) "Leave to amend to conform to proof at trial ordinarily should be liberally granted unless the opposing party would be prejudiced by the amendment." (*Faigin v. Signature Group Holdings, Inc.* (2012) 211 Cal.App.4th 726, 736 (*Faigin*).) "Leave to amend a complaint at trial is properly denied, however, if the proposed amendment raises new issues that the defendant has had no opportunity to defend," or if the material facts are undisputed and the proposed amendment as a matter of law "would not establish a basis for liability." (*Ibid.*)

Thinh also challenges the sufficiency of the evidence to support judgment in Dang's favor on any of the newly amended contract theories. A "challenge to the granting of leave to amend the complaint based on insufficiency of the evidence . . . amounts to a substantial evidence challenge." (*Faigin*, *supra*, 211 Cal.App.4th at p. 736.) "Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible and of solid value. We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence. We affirm the judgment if an examination of the entire record viewed in this light discloses substantial evidence to support the judgment." (*Ibid.*)

7

B.    *Substantial Evidence Supports the Existence of a Third Party Beneficiary Contract*

For ease of reference, we first address Thinh's argument the evidence does not support the judgment on *any* of the contract theories the trial court allowed Dang to assert by amendment. The trial court did not cumulate individual damage awards on each of three separate contract theories, but instead concluded Dang was entitled to one award of $116,000, whether based on a surety agreement, a third party beneficiary contract, or promissory estoppel.

We briefly review the nature of each of these three contract theories. A surety or guarantor is one who promises to answer for the debt of another. (Civ. Code, § 2787.) Where no conditions are specified, the guarantor becomes liable when the principal obligation matures, and the creditor need not first exhaust his remedies against the principal debtor. (*United California Bank v. Maltzman* (1974) 44 Cal.App.3d 41, 54; Civ. Code, § 2845.) A third party beneficiary, as the name implies, is an intended beneficiary of contract made by others. "A third party beneficiary may enforce a contract made expressly for his or her benefit," but has "no right to collect anything but those benefits the contracting parties agreed to confer upon [him or her]." (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 680.) Relying on promissory estoppel principles, Dang also asserted Thinh and Thanh each promised to pay him back the funds he lent Thanh. "'Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." [Citation.]'" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901-902.)

Substantial evidence supports the conclusion Thinh and Thanh intended Dang as a third party beneficiary of Thanh's agreement to ship seafood to Thinh on

8

credit.  Thinh explained in *his* pretrial brief:  "In August 2008, Thanh suggested to Thinh that he [Thanh] can repay Dang by sending products to [VietEagle] and [VietEagle], instead of paying Thanh, to pay [*sic*] Dang as payment towards the loan.  Thinh . . . decided that he would try to work with Dang to get records [from Dang's former accounting stint at VietEagle] and initially accepted this suggestion."  This account mirrored Thanh's deposition testimony acknowledging an agreement with Thanh to pay Dang from the proceeds of seafood Thanh shipped to Thinh.  And Thinh reiterated the existence of the agreement several times in his trial testimony.  For example, he admitted Thanh agreed that "instead of paying him for the products [from] Vietnam, just give the money to Dang here."

In an extended colloquy on cross-examination, Thinh provided more detail: "[Q]:  Now, before directing Christi [a VietEagle employee] to send this email, isn't it true that you had a conversation with Thanh regarding the payment?  [¶]  [A]:  Well, yes. I had talked to Mr. Thanh, who asked for my help, and so I had this letter written up.  If I did not have a promise from Mr. Thanh, I would not have the funds to provide to Mr. Dang.  [¶]  [Q]:  Now, in your deposition, you testified —  [¶]  [Court]:  Hang on. Hang on.  Explain what you mean by that, that if you did not have a promise from Mr. Thanh, you would not have the funds to provide to Mr. Dang.  [¶]  [A]:  Because he asked for my help.  If he didn't — if he didn't, then I would not have the money for Mr. Dang.  Instead, I would have to pay him, which is Thanh, money for his product.  [¶] [Court]:  Okay.  So that's what I wanted to make sure I understand — understood that. So you made a deal with Mr. Thanh where Mr. Thanh would provide you product for free, and then that would give you money to pay to Mr. Dang?  [¶]  [A]:  This is how it usually is.  Mr. Thanh provides me with the product, I sell it, I send that money back to

9

him. That's Mr. Thanh. Here, Mr. Thanh said, you [*sic*: I] will provide me [*sic*: you] the product. I will make the sale and then use the money from that product to pay what he want[s] me to pay Mr. Dang, before I send the difference back to Vietnam. [¶] Because the responsibility to pay for the product coming from Vietnam is mine. It's my responsibility to pay for that. [¶] [Court]: I understand that. [¶] [Q]: Now, is it true that in that conversation, Thanh asked you to withhold the sum $116,000 to pay Dang, and that sum includes a hundred thousand dollars in principal and $16,000 for two years of interest? You testified to that at your deposition; is that correct? [¶] [A]: Correct." (Spelling out of names for reporter's benefit omitted from foregoing quotation.)

In another colloquy, Thinh similarly explained an e-mail he sent to Dang's wife, Mai: "[Q]: Now, directing your attention to this e-mail . . . , you say . . . 'and that's the reason that I had to stop the money between Thanh and your husband.' [¶] [A]: Yes. [¶] [Q]: Could you explain what you meant by that, that you had to stop the money between Thanh and Mai's husband? [¶] [A]: What I mean is that — I said 'stop.' I mean I am not going to perform on my promise. [¶] [Q]: Your promise to Mr. Thanh to help him transfer money? [¶] [A]: Correct."

The foregoing evidence amply supports the existence of a third beneficiary contract. "[A] third party beneficiary contract must either satisfy an obligation of the promissee to pay money to the beneficiary, or the circumstances indicate the promissee intends to give the beneficiary the benefit of the promised performance." (*Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 685-686, citing 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts § 655, pp. 594-595.) Here, the record shows *both* of these ways of forming a third party beneficiary contract occurred here. Specifically, Thanh's contract with Thinh would satisfy his obligation to

10

pay money to Dang and, to accomplish this purpose, Thanh intended Dang to benefit from Thanh's and Thinh's mutual promises to supply and sell seafood, respectively.

Thinh argues Thanh's promise to supply seafood did not constitute consideration or a "new benefit" for Thinh because he "was already operating on credit" from Thanh. Thinh argues no evidence showed Thanh would *not* send him seafood *unless* Thinh "agreed to help transfer money to Dang . . . ." But Thinh mistakes the nature of consideration. It does not require an exchange of such premium value that one party would not have entered the contract "but for" a particular promise. Rather, "all the law requires for sufficient consideration for a contract is the proverbial 'peppercorn.'" (*San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 619.) Thinh conceded he received seafood of substantial value from Thanh, and Thanh reasonably could view Thinh's promise to pay the proceeds to Dang as a valuable convenience, instead of having to sell inventory himself or otherwise liquidate substantial funds and make other arrangements from Vietnam to pay Dang. Ample evidence thus supports mutual consideration in the underlying contract.

Thinh argued at trial and reiterates on appeal his position that he and Thanh rescinded their agreement that Thinh would pay Dang on Thanh's behalf. He points to the exhibits he introduced showing bank wire transfers he made in December 2009 to Thanh and Thanh's company, Kein Long, totaling $116,000. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." (Civ. Code, § 1559; *Martinez v. Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400.) But even if Thinh intended to rescind any contractual benefit for Dang by paying Thanh instead of Dang for the seafood he received, "rescission may not be allowed if a third party beneficiary has acted in reliance on the promises made for

11

his benefit." (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1487, fn. 9; accord, *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1024-1025; see, e.g., *Silveyra v. Harper* (1947) 82 Cal.App.2d 761, 766-767 ["no estoppel exists because respondent in no way changed his position to his damage in reliance on that part of the promise"].)

The existence of detrimental reliance is a question of fact. (*Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 723.) Here, the trial court reasonably could find Dang relied to his detriment on Thinh and Thanh's agreement to pay him the funds he was owed. Dang first had an inkling of the agreement in a 2008 e-mail from Thinh, and he learned more when he traveled to Vietnam in February 2009, where he met with Thanh about the overdue funds, and demanded repayment. Thanh confirmed his agreement with Thinh for Thinh to pay Dang the overdue funds, and Thanh even suggested Dang would be repaid at 20 percent instead of 8 percent interest. Nothing suggests Dang could not have initiated legal proceedings against Thanh while in Vietnam in February 2009 to recover his money, without the obstacles of international service of process or the possibility of lack of personal jurisdiction over Thanh if Dang commenced a lawsuit in the United States, given Dang had made the loan to Thanh on an earlier trip to Vietnam. Dang returned to the United States without filing suit in Vietnam or otherwise pursuing payment from Thanh, and the record supports the conclusion he turned his recovery efforts instead to Thinh once Thanh confirmed the agreement.

Back in the United States, however, Dang made little headway with Thinh. But Thinh did not rebuff Dang outright or suggest he should seek his funds from Thanh. Instead, Thinh acknowledged that his agreement with Thanh provided he would pay Dang, and the trier of fact could find Thinh strung Dang along with meetings and

discussions suggesting he would pay. As Dang's personal finances deteriorated, resulting in foreclosure in 2010 on the house securing the home equity line of credit with which Dang had loaned Thanh $100,000, Dang pleaded several times with Thinh to pay at least a portion of the funds due. Thinh scheduled more meetings with Dang, but never paid.

Thinh points to his late October 2009 e-mail "notif[ying] Dang that he had rescinded any agreement (assuming an enforceable agreement existed)" as evidence Dang should have looked to Thanh, not Thinh, for repayment. But the trier of fact was not required to ignore the substantial period through most of 2009 in which both Thanh and Thinh induced Dang to look for payment from Thinh instead of pursuing Thanh, while Dang's financial predicament deepened. No evidence suggests Thanh made his arrangement with Thinh in bad faith, or that he did not intend to make Dang whole on his loan, that he would have repudiated his obligation to Dang if Thinh refused to follow through on the agreement, or that he would not have paid Dang some or all of what he owed in February 2009 if not for his agreement with Thinh.

To the contrary, the evidence suggests Thanh, like Dang, relied on the agreement and believed Dang should look to Thinh for payment. The evidence showed Dang pleaded with Thinh for at least a $10,000 advance payment, and the trier of fact therefore could infer this amount would have made at least a temporary difference in Dang's predicament, whether or not Thinh knew of Dang's financial troubles. In any event, a reasonable trier of fact could conclude Dang relied to his detriment on the Thinh-Thanh agreement because he relinquished the opportunity to recoup personally funds from Thanh while Dang visited him in Vietnam in February 2009, and because he lost still more time in the succeeding months to pursue full or partial payment from Thanh before foreclosure on his own obligation became imminent. Substantial evidence

13

therefore supports the judgment on third party beneficiary grounds and, consequently, we need not address suretyship or promissory estoppel as independent grounds for the judgment.

C.      *Prejudice*

Alternatively, Thinh contends the trial court abused its discretion in permitting Dang to amend his complaint because the late date of the amendment severely prejudiced his ability to defend against the new claim. "An abuse of discretion occurs when, after calm and careful reflection upon the entire matter, it can fairly be said that *no* judge would reasonably make the same order under the same circumstances." (*In re Marriage of Sinks* (1988) 204 Cal.App.3d 586, 591, italics added.)

Thinh emphasizes the element of surprise in Dang's abrupt switch from a tort theory of conversion to contract theories for recovery. But a review of both the *basis* for Dang's conversion claim and the version of the complaint (FAC) at the time trial commenced, before Dang's amendment, reveals that Thinh did not suffer prejudice because the conversion theory and the third party beneficiary theory were sufficiently similar. In fact, Dang's right as a third party beneficiary to the proceeds of Thinh's sale of Thanh's seafood was the same right Dang asserted Thinh interfered with when he converted those funds to do with them as he chose, instead of paying Dang.

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) *the plaintiff's ownership or **right to possession** of the property*; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. Conversion is a strict liability tort." (*Berlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066, italics and boldface added.)

14

Here, Thinh acknowledged in his deposition that he agreed to pay Dang the proceeds of his sale of Thanh's seafood, and the FAC on which trial commenced asserted those proceeds belonged to Dang. In particular, the FAC alleged: "32. Some time between June 2007 and February 2009, nonparty Thanh paid approximately $120,000 to Defendant Thinh, individually or as an agent or representative of Defendants VietEagle and/or VietEagle Seafoods, as repayment of the original $100,000 Loan made by . . . Dang to Non-Party Thanh together with interest. [Plaintiff] *Dang is the legal and rightful owner of the Loan repayment proceeds.* [¶] 33. Defendant Thinh, individually or as an agent or representative of Defendants VietEagle and/or VietEagle Seafoods, intentionally took possession of the Loan repayment proceeds by Non-Party Thanh, without Respondent Dang's consent. Defendant Thinh, individually or as an agent or representative of Defendants VietEagle and/or VietEagle Seafoods, *has refused and continues to refuse to return the Loan repayment proceeds to . . . Dang and has kept the funds for his own use.*" (Italics added.)

If there was any doubt that the basis of Dang's asserted "legal and rightful owner[ship]" of the proceeds was the Thinh-Thanh contract, Dang's trial brief filed on the first day of trial spelled out the third party beneficiary basis for Dang's claim. The brief specified: "There are several reasons for Defendants' liability to Plaintiff for the $100,000 loan repayment and interest paid thereon. The first is discussed here. Defendants and Thanh entered into a contract whereby Plaintiff was the third-party beneficiary. Under their agreement, Thanh was to repay the loan via Defendants by shipping seafood products from Kein Long [Thanh's company] to Defendants. Defendants were then to deduct the loan repayment from the total balance it would owe to Kein Long [for seafood orders], and repay that sum directly to Plaintiff." Based on the

15

foregoing, we cannot say the trial court abused its discretion in finding Thinh suffered no prejudice from the subsequent amendment, since Thinh freely acknowledged before trial the existence of his third party beneficiary agreement with Thanh in Dang's favor and the agreement was a frequent, undisputed topic throughout the trial.

Thinh contends the belated amendment prejudiced him because, had he known of it earlier, he would have sought "[t]estimony or evidence from Thanh regarding his understanding of the deal between him and Thinh in regards to repayment of Dang's loan," and he would have produced other evidence about the nature of their agreement. He does not, however, suggest what that evidence was or might have shown. Moreover, he at all times before and during trial admitted the substance of the agreement called for him to pay the proceeds of the seafood sales to Dang, so it is far from clear what Thanh might have added of relevance, given Thinh's admission. Similarly, Thinh suggests he would have produced more detailed evidence about the proceeds of his sale of Thanh's seafood. But given Thinh's admission he made at least enough to repay $116,000 to Thanh for the seafood instead of paying Dang, there appears little relevance in further detail about the seafood transactions. He suggests he would have offered proof of Thanh's breach of the third party beneficiary contract, but he made no offer of proof explaining how Thanh breached the contract, which he admitted at trial Thanh fulfilled by sending him enough seafood to generate the $116,000 Thinh repaid to Thanh. Thinh argues he would have produced evidence this repayment constituted rescission of the third party beneficiary contract on terms he and Thanh mutually agreed upon. But as discussed, the parties may not rescind such a contract once the third party has relied on it to his detriment. We presume the judgment is correct absent an affirmative showing by

16

the appellant (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564), and having failed to demonstrate prejudice, Thinh's challenge fails.

III

DISPOSITION

The judgment is affirmed.  Respondent is entitled to his costs on appeal.


ARONSON, J.

WE CONCUR:


O'LEARY, P.J.


BEDSWORTH, J.