Filed 9/1/16  Marriage of Kimbirk CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re the Marriage of WENDY KEYES-KIMBIRK and ANTHONY J. KIMBIRK.

WENDY KEYES-KIMBIRK,

    Respondent,

v.

ANTHONY J. KIMBIRK,

    Appellant.

E062727

(Super.Ct.No. RID236266)

O P I N I O N

APPEAL from the Superior Court of Riverside County.  H. Ronald Domnitz, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Anthony J. Kimbirk, in pro. per., for Appellant.

Wendy Keyes-Kimbirk, in pro. per., for Respondent.

Appellant, Anthony J. Kimbirk (Anthony), appeals from a March 6, 2015, judgment:  (1) denying his April 28, 2011, order to show cause to modify child custody,

1

child support, visitation, and spousal support (OSC); (2) granting permanent spousal support of $500 per month to his ex-wife, respondent, Wendy Keyes-Kimbirk (Wendy); and (3) granting Wendy's request for $17,500 in attorney fees and costs.

On appeal, Anthony claims the trial court "improperly dismissed" his OSC to temporarily reduce child and spousal support, erred in awarding Wendy permanent spousal support, and "unreasonably awarded attorney's fees to [Wendy], the much higher earning spouse." We reject each of Anthony's contentions and affirm the judgment. We also deny Wendy's request for sanctions.

## I.  BACKGROUND FACTS AND PROCEDURAL HISTORY

Anthony and Wendy were married on July 25, 1999, and they separated on April 9, 2010. On May 6, 2010, Wendy filed a petition for dissolution of marriage citing irreconcilable differences. At the time of the filing of the petition, Anthony and Wendy's two children were seven and four years of age.

At the time the petition was filed, Anthony was a supervising public defender for Riverside County, where he earned $137,000 per year, while Wendy was an assistant professor with California Baptist University (CBU), earning $55,000 per year, while simultaneously working towards earning her Ph.D.

On July 19, 2010, Anthony and Wendy entered into a stipulation and order on order to show cause. Pursuant to the stipulation and order on order to show cause, Anthony agreed to pay Wendy $1,426 per month in child support and $698 per month in spousal support, plus half of the children's uninsured medical, dental and orthodontic

2

costs, child care expenses, and tuition.  The parties also agreed to terms regarding child custody.

On April 11, 2011, Anthony was, in effect, involuntarily terminated from his position as a supervising public defender with Riverside County, receiving his last paycheck on May 15, 2011.  Following his termination from employment, Anthony began a private practice, which he operated through January 2012.

On April 28, 2011, shortly after he was terminated from employment with Riverside County, Anthony filed his OSC requesting a temporary reduction to his child and spousal support obligations.  Anthony stated in his OSC that "[d]ue to my brief unemployment status and due to the fact that I am now in private practice, there has been a drop in my income and although this drop in income is expected to be short term, at the present time I am unable to pay the monthly amount of child support and spousal support as ordered."  He attached an income and expense declaration to his OSC, representing that he had "no income due to recent unemployment."

On August 31, 2011, Wendy filed a motion for a vocational examination of Anthony, noting that, in his OSC, Anthony did "not specifically state what his current income is."  On September 21, 2011, Anthony filed a motion for a vocational examination of Wendy, but withdrew his request pursuant to an October 24, 2011, stipulation for partial judgment.

Pursuant to the stipulation for partial judgment, Anthony agreed to report any income received within five days of receipt to both the court and to Wendy.  Anthony

3

prepared income and expense declarations dated June 21, 2010, April 28, 2011, June 29, 2012, January 31, 2013, and June 5, 2014.  Anthony did not submit any updated income and expense declarations between April 28, 2011 and June 29, 2012.  Anthony also submitted his 2011 federal tax return, in which he reported $37,828 in wages and a net business loss of $12,086 from his private practice, resulting in total income of $25,742.  The business loss resulted from gross receipts of $25,038 and expenses of $37,124, as shown in schedule C.

On February 23, 2012, the vocational evaluator presented his vocational examination report of Anthony.  In January 2012, Anthony had submitted a "profit and loss statement" (P&L) to the vocational evaluator (Mr. Bonneau, incorrectly named "Mr. Benoit" in the reporter's transcript).[1]  A detailed understanding of the P&L is important for the resolution of the appeal as to the denial of Anthony's OSC to modify support levels.

Although Anthony was found by the court to have been in private practice starting after he left the Riverside County Public Defender's Office in April 2011 and received his last paycheck May 15, 2011, and continuing until February 2012, the P&L only presents monthly gross income, expense, and net income figures for three of those months.  The P&L appears to be the printout of a spreadsheet with seven rows of figures displayed in three columns of figures, above which appear the labels "INCOME,"

---

[1] The vocational evaluator testified during the trial on December 9, 2013, but the reporter's transcripts in the appellate record do not include that day's proceedings.

4

"EXPENSE," and "NET." Thus, the top five rows of figures state gross receipts of income, expenses, and net income only for November (respectively, $20,480, $11,044.92, and $9,435.08) and December ($5,350, $4,592.08, and $757.92) 2011 and January 2012 ($0, $418.81, and -$418.81), for a total net income of $9,774.11 (the fourth row) and a monthly average of $3,258 (the fifth row) for the three-month period. The first of the bottom two rows is labeled "12 MO AVG" and the second "2011 NET," and the figures of the second row ($48,649.09, $23,611.56, and $25,037.52) are 12 times the figures of the first row ($4,054.09, 1,967.63, and $2,086.46).[2]

However, the source of the figures does not appear on the spreadsheet nor does it appear anywhere in the reporter's transcripts or appendices, and whether the average figures were derived from the total figures, or vice versa, is not discernible. Anthony's testimony does make clear that the $48,649.09 is revenue, and the labels above the top five rows of figures appear to apply as well to the two bottom rows so that the second column figures are expenses and the third column figures are net income.

The vocational evaluator's report casts some light on the P&L. The three figures in the bottom row appear in the vocational evaluator's report. as being "2011 Income - $48,649.09, less expenses of $23,611.56," and on the next line "Net was $25,037.52." The report understands that income to have been earned over the period April 2011 to February 2012. "Duration of Employment," earlier described "as solo practitioner in a private practice," was "April 2011 to present." The source of the income was described

_____

[2] The $48,649.09 should be a penny less—12 x $4,054.09 = $48,649.08.

as "[a]pproximately 85% . . . from family law [mediation] and 20% [*sic*] . . . from criminal law." The vocational evaluator reported on the following page, "[Anthony] has been a sole practitioner in a criminal law and family law mediation practice from April 2011 to present." Anthony told him that "when he started his practice, he was taking any and all criminal defense cases[, but] he had no real pipeline of referrals," and he started doing family law mediation in late October 2011. The report concluded that Anthony's earning capacity ranged from $80,000 to $120,000 per year.

In February 2012, Anthony closed his private practice and began working for a private firm. Anthony worked for this firm for approximately five months until he was laid off on June 27, 2012. During this five-month period of employment, Anthony earned $28,482.04. After being laid off, he collected unemployment benefits from July 2012 to January 2013, and he reported zero income on his January 31, 2013 income and expense declaration because his "unemployment benefits [had] run out."

On March 8, 2012, Anthony and Wendy settled property issues and arrearages through April 28, 2011. However, issues related to Anthony's OSC, namely, his request for temporary reductions in spousal support and child support, remained unresolved.

At the May 21, 2012, trial readiness conference, Commissioner Tamara Wagner scheduled the trial and a mandatory settlement conference (MSC) for July 10, 2012. Commissioner Wagner ordered Anthony to submit a current income and expense declaration, his paystubs from his then-employer, and his tax returns, no later than June 29, 2012. Commissioner Wagner advised the parties that, at the July 10, 2012 trial and

MSC, she intended to resolve issues related to child support, spousal support, and attorney fees. The July 10, 2012, trial and MSC were continued to November 13, 2012.

At the November 13, 2012 trial, Commissioner Wagner concluded that Anthony's separation from employment in February 2012 was not voluntary, and she continued the trial to February 13, 2013. The parties also agreed to reopen discovery regarding Anthony's income during private practice. The trial was later continued to April 25, 2013, and then reset to May 8, 2013.

Anthony was hired by San Bernardino County as a public defender on April 25, 2013. As of November 23, 2013, Anthony earned $10,688 per month in salary in his new position.

On April 30, 2013, Anthony filed a peremptory challenge (Code Civ. Proc., § 170.6) to Judge Magers. The May 8, 2013 trial date was vacated, the case was assigned to Judge H. Ronald Domnitz, and a new trial date was set for September 19, 2013. The trial finally began on December 9, 2013, and the court received evidence from the vocational expert. At the end of the day, the court continued the trial to December 19, 2013.

On December 19, 2013, the second day of trial, both Anthony and Wendy testified in order to assist the court in determining whether Anthony "maximized [his] earning capacity," and whether to impute earnings to him from May 2011 to February 2012,[3]

---

[3] On January 23, 2014, the court ruled it would impute income to Anthony for the months of November and December 2011, and January 2012.

7

when he operated his private practice. Anthony admitted to the court that, despite a court order, he did not submit an updated income and expense declaration between April 28, 2011 and June 29, 2012, and that he only paid a "reduced amount" of the "court-ordered support during [his] employment with [the] law firm."

At the December 19, 2013 trial, the court found that Anthony "did not comply with the court order" to report his income to the court within five days of receipt. Because Wendy contended that Anthony's 2011 tax return and his submissions to the vocational evaluator were insufficient, the court appointed a special master, Robert Wesley (SM Wesley), "[t]o determine [Anthony's] actual income available for support purposes from 4/28/11 to 2/2/12. The Court reserve[d] the right [to] adjust the amount up or down depending on the testimony/evidence regarding 'best efforts' to maximize employment/income." The court advised Anthony during the hearing that, "[w]hat I expect you to do is give [SM Wesley] all of your books and records." The court set a return date of March 14, 2014 to review SM Wesley's report, and to schedule a trial on the remaining issues. At the December 19, 2013 hearing, Anthony did not object to the appointment of SM Wesley, and only asked the court whether he could "redact client names to protect confidentiality."

On December 30, 2013, SM Wesley sent a letter to Anthony and Wendy requesting that they fill out a questionnaire, and requesting various documents related to Anthony's private practice so that he could "determine [Anthony's] income for the purposes of support." On February 12, 2014, Anthony sent correspondence to SM

Wesley expressing concern with the "request for discovery." First, Anthony stated that the only two documents available for SM Wesley's review were his 2011 tax return and his statement of benefits during a period of unemployment, which he had already provided. He did not mention the P&L. He then advised SM Wesley that "[w]e have already begun trial and as the Court has informed [Wendy] discovery on this case is closed. As you are aware neither the Court, nor a special master acting within the power of the Court, may compel discovery on its own motion past the discovery cutoff date." He also described SM Wesley in the letter "as a sort of investigating attorney on behalf of [Wendy]."

On February 20, 2014, and in response to Anthony's letter, SM Wesley sent a letter to Judge Domnitz, and to both parties, seeking guidance, as the only information in his possession for review was Anthony's 2011 tax return. SM Wesley stated in his letter: "This puts me in an untenable position. The tax returns are only as good as the information used to complete them. By reviewing only the tax returns and basing a recommendation thereon, I may well be misleading the court as to the actual income. Further, the court can read a tax return as easily as I can. Accordingly, if I do not have access to the source documents it would be a waste of the parties' funds and may not lead to the truth."

On February 28, 2014, Anthony filed a brief regarding the status of the special master, again reiterating that the reopening of discovery was not warranted, and that the court needed no further information to decide the issue of "attorney's fees and long term

9

spousal support." He also stated in his brief that he objected to "the appointment of a special master for any purpose. To the extent that [his] consent [could] be deemed given to such an appointment, it is withdrawn."

At the March 14, 2014, hearing to review SM Wesley's report, Judge Domnitz recognized that "[Anthony] has not cooperated with the special master," but elected, at that time, not to "make orders unless [Wendy] file[d] something." Judge Domnitz then set the trial for June 11, 2014 to rule on Wendy's request for attorney fees and permanent spousal support and on Anthony's OSC. The trial was continued, and was ultimately held on August 27, 2014.

Both Anthony and Wendy submitted trial briefs regarding permanent spousal support and attorney fees, and agreed that their trial briefs would serve as their direct testimony, subject to cross-examination. Regarding her request for permanent spousal support, Wendy testified regarding her earning capacity, and her inability to maintain the marital standard of living without incurring substantial debt and hardship. She also testified that, although she and Anthony had resolved the issue of arrears owed to her from the date of separation to April 28, 2011, Anthony paid only a total of $7,500 in child support, and nothing in spousal support, for the years 2012 and 2013, and he had not contributed to the children's education since February 2011. She also testified regarding her request for attorney fees.

Regarding Wendy's request for spousal support, Anthony testified Wendy was underemployed, as she could have obtained higher-paying jobs with other universities.

10

He also testified regarding his own earning capacity, and testified regarding his separate property.

On November 6, 2014, the court issued its decision after trial denying Anthony's OSC for support modification "in light of [Anthony's] failure to comply with" two orders of the court for Anthony to (1) "submit his private practice income and expense books and records for analysis of [SM Wesley]," and (2) "submit his financial records to [Wendy's] attorney on a quarterly basis[4] to determine his income for his private practice." Since Anthony failed to comply with the court's orders regarding the disclosure of "his financial information relative to his income from private practice," the court concluded it had "no credible evidence upon which to base a finding of changed financial circumstances, a prerequisite for a successful OSC to modify support. [Anthony's] single submission and tax return do not lend credence to his position as they are inconsistent and unsupported. His burden of proof was unmet." The court also granted Wendy's request for permanent spousal support of $500 per month and awarded her $17,500 in attorney fees and costs. Judgment was entered on March 6, 2015.

## II. DISCUSSION

A. *The Trial Court Properly Denied Anthony's OSC to Modify Custody and Support*

Anthony's argument that the trial court erred in denying his OSC is based on his contention that his 2011 tax return presumptively established a material reduction in his

---

**4** The order was for Anthony to "report any income received within 5 days of receiving it" to both the trial court and to Wendy.

income and that no evidence rebutted the presumption.  The argument and its supporting contentions are specious.

"Modification of a spousal support order may be made only on a showing of a material change in circumstances after the last order."  (*In re Marriage of Tydlaska*, (2003) 114 Cal.App.4th 572, 575.)  The moving party bears the burden of showing a material change in circumstances to support the modification request.  (*In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291, 1303 [child support]; *In re Marriage of Tydlaska*, *supra*, at p. 575 [spousal support].)  The trial court's modification decision is reviewed for abuse of discretion, and "[a]n abuse of discretion is shown only when, "'. . . after calm and careful reflection upon the entire matter, it can fairly be said that no judge would reasonably make the same order under the same circumstances.  [Citation.]'" [Citation.]"  (*In re Marriage of Tydlaska*, *supra*, at p. 575; see *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 555.)

"A parent's gross income, as stated under penalty of perjury on recent tax returns, should be presumptively correct."  (*In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332.)  However, the court may disregard the moving party's tax return if there is doubt regarding its accuracy; for example, where there is a discrepancy between the tax return and other documents.  (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 35.)

In this case, there was a discrepancy between schedule C of Anthony's 2011 income tax return and the P&L.  The P&L showed $48,649.09 in gross receipts in 2011,

but schedule C reported gross receipts of $25,038 in 2011, swallowing entirely Anthony's purported $12,086 loss. This discrepancy supports the trial court's decision to require a special master to obtain the business records concerning the 2011 tax return.[5] This discrepancy also supports the trial court's ultimate determination that "[Anthony]'s single submission and tax return do not lend credence to his position as they are inconsistent and unsupported. His burden of proof was unmet."

We conclude the trial court did not abuse its discretion in determining that the presumption that Anthony's 2011 tax return correctly stated his income for the period of his private practice was rebutted and that he failed to meet his burden to show a material change in circumstances.

Anthony contends in his opening brief that the P&L and schedule C were consistent. "Exhibit eight [P&L] reflects an unsworn profit and loss statement from [Anthony]'s time of private practice. The exhibit notes total income for three months of private practice was $9,774.19 or $3,258 per month. Additionally, the profit and loss statement reflects $25,037.52 as the net income from private practice earnings in 2011.

---

[5] "THE COURT: And with respect to determining the amount of actual income, and correct me if I'm wrong, the only thing I have . . . . [¶] . . . [¶] THE COURT: . . . With respect to the time that you were in private practice, 2011 [until] you got the job[,] is the 2011 tax return and the little slip that you gave to the vocational evaluator; correct? [¶] MR. KIMBIRK: That's correct. [¶] THE COURT: And as I understand it, Ms. Kimbirk, you believe that's not sufficient for me to base a finding. Am I correct? [¶] MRS. KIMBIRK: That is my position, yes. [¶] THE COURT: Okay. Sir, I'm going to order that the issue of your income during private practice be decided in the first instance by a special master. . . ." The trial court would not have ordered the special master unless it had agreed with Wendy's position.

13

This is the same amount that is reflected in the net earnings from the profit and loss statement in [Anthony]'s 2011 tax return presented as [Wendy]'s exhibit nine [tax return]." "[Anthony] accounts for an *additional* $37,124 in expenses on his tax return reflecting the net income to be negative $12,086. No evidence was presented that discredited this amount." (Italics added.) "The amounts divulged in [Wendy]'s exhibits eight [P&L] and nine [tax return] did not contradict the $25,037.52 private practice income stated by [Anthony]. The only question is whether the rebuttable presumption as to the accuracy of [Anthony]'s tax return was overcome as to the *additional* $37,124 claimed in expenses. Since no evidence was presented on this topic, that answer is clearly no." (Italics added.) "When all expenses were accounted for, [Anthony] had negative income from his time in private practice."

No additional evidence was required to overcome the rebuttable presumption that the tax return and the expenses claimed were accurate—the P&L and schedule C were all that was necessary to rebut any presumption of accuracy because they contradict each other. The bottom line of the P&L shows "2011 NET 48,649.09   23,611.56   25,037.52," which, despite the 1-cent error, appears to show gross receipts, expenses, and net income. These figures contradict schedule C, which shows gross receipts/income of $25,038, expenses of $37,124, and a net loss of $12,086. The $25,037.52 does round up to $25,038, but while this congruence of dollar amounts impresses Anthony as showing a consistency between the P&L and schedule C, it is in fact an inconsistency because the $25,037.52 is a net figure in the P&L and the $25,038 in schedule C is a gross figure: the

14

$48,649.09 gross figure from the P&L should appear as the gross receipts/income figures on schedule C, not the rounded up P&L net figure of $25,037.52. The net versus gross discrepancy is more than enough to cast doubt on the veracity of schedule C and rebut the presumption in favor of the accuracy of the tax return's net loss.

Another contradiction concerns expenses. The expenses in the P&L ($23,611.56) are less than those claimed on schedule C ($37,124), although Anthony appears not to consider that a contradiction because the appellant's opening brief twice characterizes the schedule C expenses as "additional." However, this characterization implies that some or all of the P&L expenses were not itemized or claimed on schedule C, which was the case. In his testimony Anthony was unable to reconcile his claimed business expenses with the amounts he reported on his 2011 tax return. The court recognized Anthony "didn't put down all these expenses he said he had." Thus, the use of the P&L net income figure ($25,037.52) as schedule C gross receipts/income figure ($25,038) allowed Anthony to deduct $23,611.56 in expenses, some or all of which were not reported on schedule C, further diminishing the tax return's credibility.

These contradictions completely undermined the credibility of the tax return and P&L so as to make them worthless for proving Anthony's private practice income. Without the tax return, Anthony's argument that he carried his evidentiary burden collapses.

In support of his contention that he carried his evidentiary burden, he asserts: "The Court also found [Anthony] earned 'SUBSTANTIALLY LESS IN HIS OWN

15

PRACTICE.'" This phrase was lifted out of the trial court's "Decision After Trial On Limited Issues" dated January 23, 2014, after the hearings in December 2013, during which the trial court referred the issue of Anthony's private practice income to a special master. The trial court had just finished with that issue, "declin[ing] to impute income for the period of May 2011—February 2012" and "reserv[ing] on the amount to be imputed until the Special Master has completed his task." Then the court addressed the next time period, explaining that "[Anthony] found employment in February 2012 for $100,000/year after earning substantially less in his own practice." Having just "decline[d] to impute income," the court did not contradict itself in the next sentence by finding what it had already determined it could not find. Thus, Anthony's argument that the court did so ignores the context of the lifted statement.

Anthony takes the position that he has been "more than forthright in presentation of financial information," and that he reported his income in the P&L "for each of three months he remained in private practice and thus complied" with his duty to report his income. On the contrary, the P&L did not report Anthony's income from private practice.

The top part of the P&L has five rows of figures showing income, expenses, net income, total net income and average net income for November and December 2011 and January 2012. The figures cover only three months of the approximately nine-month period after his termination on April 25, 2011 through January 2012, during which he was in private practice.

16

The bottom part of the P&L contains two lines related to each other and to schedule C, albeit inconsistently, as discussed above. The first line is labeled "12 MO AVG" with amounts one-twelfth of the amounts in the second line labeled "2011 NET." The 12 months of 2011 do not coincide with the nine-month private practice period, roughly May 2011 through January 2012. The amounts in the top part of the P&L do not appear to bear any relation to the average or annual amounts in the bottom part so that the top part figures are not the source of the average or total bottom part figures, which are unsupported by any evidence.

Thus, Anthony's income from private practice cannot be reasonably inferred from the P&L, further demonstrating that Anthony did not carry his burden to show a material change in circumstances.

Given that the court had not abused its discretion in deciding that Anthony had failed to meet his evidentiary burden to establish a change of circumstances, the appointment of a special master can now be seen in its proper perspective. Anthony contends that the appointment of a special master to gather documentation supporting the 2011 tax return was in effect an attempt to conduct discovery after the pretrial deadline for doing so (see *In re Marriage of Boblitt* (2014) 223 Cal.App.4th 1004, 1022 [family law proceedings subject to 30-day pretrial discovery deadline]), and that the denial of Anthony's order to show cause sanctioned his failure to comply with a belated discovery order (*In re Marriage of Loh*, *supra*, 93 Cal.App.4th at pp. 329-331). However, far from being a belated attempt to conduct discovery on Wendy's behalf, the court was giving

17

Anthony a last chance to introduce evidence to meet his burden to show a change of circumstances. His decision not to avail himself of that opportunity left the trial court with no credible evidence of a reduction in income, justifying denial of the order to show cause. Thus, Anthony's contentions are specious that the court violated the prohibition against belated discovery on Wendy's behalf and sanctioned Anthony for a discovery violation.

B. *The Trial Court Did Not Err in Granting Wendy Permanent Spousal Support*

Anthony contends it was error for the court to award permanent spousal support to Wendy, as the court failed to consider his exhibits that "would have formed the basis to impute income to" Wendy. Anthony asserts that Wendy was not living up to her income potential because she remained at a job that paid less than similar jobs at other universities, and the enumerated Family Code section 4320[6] factors did not support her request. We conclude the trial court properly granted Wendy's request for permanent spousal support.

1. Background—Anthony's and Wendy's Evidence

In advance of the August 27, 2014 trial, Wendy requested that Anthony be ordered to pay her permanent spousal support starting from April 20, 2013, the date Anthony was hired as a public defender for San Bernardino County. In her trial brief, she discussed how the statutory factors enumerated in section 4320 supported her request for permanent

---

[6] All further statutory references are to the Family Code unless otherwise indicated.

18

spousal support. Anthony countered that the section 4320 factors did not support Wendy's request. Anthony argued, among other things, that Wendy was not living up to her income potential, and that the balance of hardships did not support her request.

As noted, at the time of their separation, Anthony earned $137,000 per year while Wendy earned approximately $55,000 per year, or slightly less than $4,600 per month. Wendy's net pay was $3,600 per month while her monthly total expenses were about $6,600 per month.

Although she modified the mortgage on the marital home, which was awarded to her in the divorce and which reduced her mortgage by approximately $1,000 per month, Wendy had exhausted all of her savings. In order to maintain the marital standard of living, Wendy took out $66,000 in loans, in addition to other student loans that were not reimbursed by her employer, CBU. (§ 4320, subds. (a), (d).) She testified that she had paid all of the children's private school tuition since February 2011, even though Anthony had been ordered to pay half of the children's tuition.

Wendy began her employment with CBU in 2008 as a full-time lecturer. She was promoted to assistant professor in 2009, even though she did not have a Ph.D., and most universities required their full-time faculty, such as assistant professors, to have Ph.D.'s. CBU hired and promoted Wendy pursuant to its "internal strategy" of hiring "at the master's level and then provid[ing] assistance to complete a terminal degree, a Ph.D." Pursuant to this arrangement, CBU provided Wendy $45,000 in tuition reimbursement, and it implemented a "forgivable loan program [that] would secure years of service with

19

the university," but that required Wendy, as a condition of continued employment with CBU, to obtain her Ph.D. within a determinate amount of time. Upon completion of her Ph.D., Wendy anticipated a pay increase of around $5,000 over her currently salary, as well as a potential promotion to associate professor. Wendy testified that her current salary of approximately $55,000 per year as an assistant professor was already higher than the average salary for an associate professor at CBU.

Anthony challenged whether Wendy was "living up to [her] income potential" by "remain[ing] at a lower paying job because of her comfort level." Anthony offered evidence of "current opportunities for which [Wendy] is qualified," and where the salaries ranged from $71,000 to $127,000. He testified that, based on his research, an assistant professor like Wendy should earn between $76,000 to $110,000 a year. Anthony also argued that, once Wendy completed her Ph.D., she faced "better prospects" because her income level would presumably increase, while "his situation can be expected to improve only marginally."

Wendy testified she would not be hired for the positions that Anthony suggested she qualified for, as most university systems, "with the exception of the junior colleges and other Christian universities in the CCCU system [such as CBU]" "require a Ph.D for full-time faculty." Anthony conceded that some of the jobs referenced in his exhibits did require a Ph.D., but he asserted that Wendy would still qualify for some of the positions that only required a master's degree.

Anthony also stated that he had incurred $60,000 in credit card debt due to his own unemployment, as well as his current wife's unemployment due to a year-long battle with cancer,[7] and that the "financial backlog facing him now" swung the balance of hardships (§ 4320, subd. (k)) in his favor. Wendy argued the balance of hardships (*ibid.*) supported her request for spousal support, as Anthony "enjoys an improved standard of living since [his second] marriage, in that [Anthony] has enjoyed numerous vacations (at least 2-3 per year), including at least two international vacations; he employs a housekeeper and a gardener; and enjoys an upper-middle class standard of living." (§ 4320, subd. (a).) Wendy also asserted that Anthony had the ability to pay support (§ 4320, subd. (c)), as he had a gross monthly income of $11,578.67[8] and total expenses of $7,565, of which $6,250 was paid by others. She also listed Anthony's assets, which included a new home that he co-owned with his new wife, as well as unencumbered real estate that he co-owned with his brother. (§ 4320, subd. (e).) She testified that she had negative equity in the marital home even after her loan modification, as she still owed approximately $300,000 on that property, and its current market value was between $230,000 and $250,000. (*Ibid.*)

---

[7] It is unclear from the record when Anthony remarried, but it appears he remarried between June 29, 2012 and November 23, 2013.

[8] Anthony's June 5, 2014, income and expense declaration reported a monthly salary of $10,688.

## 2. Trial Court's Decision After Trial Awarding Permanent Spousal Support

The court awarded Wendy $500 per month "for Spousal Support, until further order of Court, [Wendy's] remarriage or death of either party." It determined that Wendy was "unable to maintain the marital standard of living without assistance from [Anthony]," as she "has substantial debt which she could not pay due to lack of child support and spousal support payments from [Anthony]." (§ 4320, subds. (a), (d).) It also explained that "there is no doubt that [Anthony] has the ability to pay reasonable support and that [Wendy] is in need of same," as Anthony "appears to be living above the marital standard" and "has [far] greater income and fewer monthly expenses than [Wendy]." (§ 4320, subd. (c).) The court concluded that "[t]he balancing of hardships between the parties is not difficult . . . . [¶] If spousal support were not to be granted, [Wendy] will continue to suffer financially while [Anthony] will not. She should not be required to struggle to barely meet her reasonable needs when [Anthony] can easily afford to assist" (§ 4320, subds. (c), (k)), particularly where "[Wendy] basically has a negative estate and [Anthony] at least has a half interest in a home which he and his brother equally own" (§ 4320, subd. (e)).

The court further found Wendy's employment at CBU to be "reasonable," particularly because CBU contributed to her tuition costs. (§ 4320, subd. (g).) However, the court stated that "[Wendy] must understand that she must continue to use her best efforts to become self-supporting. The pursuit of a [Ph.D.] should be a stride towards that goal—not just [a] quest for personal achievement." (§ 4320, subd. (*l*).)

22

3. <u>Analysis</u>

In ordering permanent spousal support, the trial court must consider and weigh the relevant section 4320 factors.  (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1316.)  The marital standard of living "'is relevant as a reference point against which the other statutory factors [of section 4320] are to be weighed. . . .'  [Citation.]" (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1585.)  Other relevant statutory factors include the supporting spouse's ability to pay (§ 4320, subd. (c)); the needs of each party, based on the marital standard of living (§ 4320, subds. (a), (d)); the obligations and assets of each party (§ 4320, subd. (e)); the ability of the supported spouse to engage in gainful employment (§ 4320, subd. (g)); the balance of hardships to the parties (§ 4320, subd. (k)); and the goal that the supported party be self-supporting within a reasonable period of time (§ 4320, subd. (*l*)).  (§ 4320; *In re Marriage of Williamson*, *supra*, at p. 1316.)

"'"'In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each.'"'"  (*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1297; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304.)  However, as long as the trial court considers and weighs the statutory factors, "'the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion.' [Citation.]"  (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1150.)  An abuse of discretion is shown "'where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably

make the same order under the same circumstances.'" (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480; see *In re Marriage of LaMoure* (2011) 198 Cal.App.4th 807, 829.)

As noted, in reaching its decision to award Wendy $500 per month in permanent spousal support, the court considered and weighed the relevant statutory factors of section 4320, such as ensuring that both parties maintained the marital standard of living (§ 4320, subds. (a), (d)), Anthony's ability to pay spousal support (§ 4320, subd. (c)), each party's obligations and assets (§ 4320, subd. (e)), the reasonableness of Wendy's employment (§ 4320, subd. (g)), and the balance of hardships (§ 4320, subd. (k)), as well as the goal that Wendy become self-supporting within a reasonable period of time (§ 4320, subd. (*l*)).  After considering the section 4320 factors, the court granted Wendy's request for permanent spousal support, explaining that Wendy would be "unable to maintain the marital standard of living without assistance from" Anthony, as she has "substantial debt which she could not pay due to lack of child support and spousal support payments from [Anthony]."  (§ 4320, subds. (a), (d).)  The court explained that the "balancing of hardships between the parties is not difficult as [Anthony] has [far] greater income and fewer monthly expenses than [Wendy]," and Wendy would "continue to suffer financially while [Anthony] [would] not" if it did not grant Wendy's request for permanent spousal support.  (§ 4320, subds. (c), (d), (k).)  Because the trial court properly considered and weighed the section 4320 factors, it was not an abuse of the court's discretion to grant Wendy's request for permanent spousal support.

Anthony argues that the court should have imputed income to Wendy "in a range of similarly situated college professors," and that the court "failed to properly consider all of the evidence before it related to factors laid out in Family Code Section 4320" because the court made no mention of the exhibits (job postings and salary data for assistant professors) he submitted with his trial brief, and "gave no analysis whatsoever as to whether [Wendy] should be imputed income, further evidencing that the relevant exhibits were not considered by the Court." Although a court *may* impute income based on a party's earning capacity, it is not required to do so. (*In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 301 ["trial courts have discretion to impute income to a parent based on earning capacity."].) More importantly, the record does not support Anthony's assertion that the court did not possess, or did not consider, the job postings and salary data that Anthony attached as exhibits to his trial brief, as the record included a number of job postings and salary data for college faculty positions, which were not, as Anthony incorrectly asserts, "exhibits relevant to a[n] [issue] surrounding the marital children's schooling . . . ."

For these reasons, it was not error for the trial court to grant Wendy's request for permanent spousal support.

C. *The Trial Court Did Not Abuse Its Discretion in Granting Wendy's Request for Attorney Fees*

Anthony next challenges the court's decision ordering him to pay Wendy $17,500 for her attorney fees and costs. He argues that the court erred in granting Wendy's

request because "she was the high earner for the majority of the litigation," "her actions were [frivolous]," and she "cannot reasonably claim a need for attorney's fees." We reject Anthony's contentions.

1. Background

Wendy requested that the trial court grant her request for attorney fees pursuant to section 271, subdivision (a), which authorizes the court to award one party's attorney fees and costs as a sanction, where the conduct of the offending party "frustrates the policy of the law to promote settlement of litigation . . . ." (§ 271, subd. (a).) Wendy contended the court should grant her request because it had "been over three years since [Anthony] filed his motion to modify support (filed 4/28/11)," and Anthony's "refusal to comply with court orders has severely frustrated the proceedings, and prevented a timely and equitable resolution to this case. [Anthony's] conduct has caused [Wendy] to incur substantial legal fees, including expert witness fees."

Wendy attached a declaration, dated August 15, 2014, stating she had incurred a total of $33,060.55 in attorney fees, with $8,513.94 still unpaid. She also stated she had incurred a total of $4,460 in costs for the vocational expert. On July 10, 2012, her former counsel confirmed that Wendy had incurred $21,748.36 in attorney fees and $3,160 in costs for the vocational expert. Her current trial counsel also submitted a declaration stating that, as of August 15, 2014, Wendy had paid her $3,250 in attorney fees, and counsel anticipated her total legal fees would reach or exceed $5,000.

Anthony argued Wendy's request for attorney fees should be denied on a number of grounds. First, he contended that granting her request was improper "given [her] refusal to resolve the case short of trial and frivolous attempts to re-litigate resolved issues." He also claimed that Wendy's attorneys were incompetent, as they failed (1) to gather evidence regarding job opportunities that were available to him, (2) to establish his earning capacity in private practice, and (3) to dispute the veracity of his 2011 tax return.

The court declined to grant Wendy's request for attorney fees pursuant to section 271, but ordered Anthony, pursuant to section 2030, "to pay a contribution of $17,500 in attorney's fees to [Wendy] at a rate of $500/month, payable on the first of each month," or approximately half the amount requested by Wendy. The court determined that Wendy's request was "supported by properly substantiated declarations" from her and her prior counsel, that "[t]hese expenses were necessary and reasonable," and that "there is a great disparity in income and expenses between the parties and [Anthony] is well able to afford to contribute."

2. Analysis

"In a proceeding for dissolution of marriage . . . the court shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, . . . whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding . . . ." (§ 2030, subd. (a)(1).) "The court may make an award of attorney's fees and costs under Section 2030 . . . where the making of

27

the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).)

The purpose of sections 2030 and 2032 "'is *not* the redistribution of money from the greater income party to the lesser income party,' but rather '*parity*: a fair hearing with two sides equally represented.' [Citation.]" (*In re Marriage of Sharples* (2014) 223 Cal.App.4th 160, 164.) "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." (§ 2032, subd. (b).) In addition to the parties' financial resources, the court may consider the parties' trial tactics. (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 975.)

The trial court has broad discretion in ruling on a motion for fees and costs pursuant to sections 2030 and 2032, and its order shall not be reversed "absent a showing that no judge could reasonably have made the order, considering all of the evidence viewed most favorably in support of the order." (*In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 657.) One court concluded that it is not an abuse of discretion to award the mother one-third of the attorney fees she had actually incurred, despite the father's contention that the mother was in a better financial condition than the father, where the court considered the parties' respective income and expenses, their assets, and the parties'

respective ability to fund litigation. (*In re Marriage of M.A. & M.A.* (2015) 234 Cal.App.4th 894, 902-903.)

Here, the record reflects the court's consideration of Anthony's and Wendy's respective incomes and expenses, their respective abilities to fund the litigation, and whether granting Wendy's request furthered the purpose of sections 2030 and 2032 to ensure that both parties were "'equally represented.'" (*In re Marriage of Sharples*, *supra*, 223 Cal.App.4th at p. 164.) As noted, in ordering Anthony to pay half of Wendy's attorney fees and costs, the court explained that "there is a great disparity in income and expenses between the parties and [Anthony] is well able to afford to contribute" towards Wendy's attorney fees, which the court found to be "necessary and reasonable." The court also recognized that Wendy "represented herself much of the time against the legal skills of [Anthony]," a trained attorney, which furthers section 2030's purpose of ensuring each party has access to legal representation, and of preserving each party's rights. (§ 2030, subd. (a)(1).) On this basis, we conclude that it was not an abuse of discretion for the trial court to order Anthony to pay approximately half of Wendy's incurred attorney fees and costs.

Anthony alleges that "[Wendy's] efforts through [her prior counsel] were frivolous and incompetent," as her prior counsel "gathered no evidence to present towards the earning capacity of [Anthony] in private practice," and because her prior counsel "gathered no evidence to dispute" Anthony's 2011 tax return "even though [she was the] first to introduce the document into evidence." As discussed, Anthony failed to comply

29

with multiple court orders to produce documents to support his claim of reduced income and earning capacity. "Where a party unlawfully withholds evidence of his income and assets, he will not be heard to complain that an order [for an attorney fee award] is not based on the evidence he refuses to disclose." (*In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 458.) Furthermore, although the trial court's decision after trial did not address Wendy's litigation tactics and whether they were, as Anthony alleges, "frivolous and incompetent," at least one court has explained that, by not addressing this issue in its ruling, the trial court has "presumably rejected [this] argument." (*In re Marriage of Winternitz*, *supra*, 235 Cal.App.4th at p. 658.)

Anthony also argues that "[he] is aware of no legal authority" for the court to award attorney fees and costs based on his "current income," which he earned "three to four years after" Wendy incurred her legal expenses, while she "was the high earner at the time these expenses were incurred." Anthony relies on *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238 for the proposition that it is error to award "attorney fees when [the] payor spouse had a negative cash flow that was not considered by the Court." *Alan S.* does not support Anthony's contention. In *Alan S.*, the trial court issued an attorney fee order against the husband, but it did not consider significant sections 2030 and 2032 factors, such as the husband's negative monthly cash flow, the respective amounts of property owned by the parties (including the wife's income-producing property, as well as whether either spouse had equity in their current home), child support that the husband was already paying the wife, contributions from new partners, and

30

whether the wife incurred fees that were not reasonably necessary for the litigation. (*Alan S. v. Superior Court*, *supra*, at pp. 242-243.) Here, and unlike *Alan S.*, the trial court considered the sections 2030 and 2032 factors when it determined that the amount of Wendy's attorney fees and costs were "necessary and reasonable" (§ 2032 subds. (a), (b)), that there was "a great disparity in income and expenses between the parties" (§ 2030, subd. (a)), and that Anthony "is well able to afford to contribute" towards half of Wendy's attorney fees and costs (*ibid.*).

Furthermore, contrary to Anthony's assertion, in assessing a party's relative need and the other party's ability to pay an award of attorney fees, it is well-established that a trial court may consider "'"'"all evidence concerning the parties' *current incomes*, assets, and abilities.'"'"'" (*In re Marriage of Falcone & Fyke*, *supra*, 203 Cal.App.4th at p. 975, italics added; *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662; see *In re Marriage of M.A. & M.A.*, *supra*, 234 Cal.App.4th at pp. 902-903 ["The court is not limited to considering the parties' salaries. The court may also consider all evidence of the parties' income, assets and abilities."].)

D. *Wendy's Requests for Judicial Notice and Sanctions Are Denied*

On October 1, 2015, Wendy filed a request to dismiss Anthony's appeal, a request for sanctions for filing a "frivolous" appeal, and a request for judicial notice of two documents in support of the request for sanctions. On November 24, 2015, we denied Wendy's request to dismiss the appeal, but reserved ruling on her request for sanctions,

and her request for judicial notice in support of sanctions, with this appeal. We now deny these requests.

1. Wendy's Request for Judicial Notice Is Denied

Wendy requested that this court take judicial notice of two pleadings, both filed by Anthony: (1) a May 6, 2015 brief regarding a stay of proceedings and (2) an undertaking by personal sureties filed on May 12, 2015.

Although both documents are records of the trial court and subject to judicial notice (Evid. Code, § 452, subd. (d); Cal. Rules of Court, rule 8.252), neither document was part of the record when the trial court issued its November 6, 2014, decision after trial. For this reason, we decline to take judicial notice of either document. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [absent exceptional circumstances, reviewing courts generally do not take judicial notice of evidence not presented to the trial court]; *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 ["While the reviewing court may take judicial notice of matters not before the trial court, it need not do so."].)

2. Wendy's Request for Sanctions Is Denied

Wendy contends that "[s]anctions are warranted" because Anthony filed a "frivolous" appeal that "is causing unnecessary delay." Although Anthony's appeal ultimately lacked merit, it does not warrant sanctions.

"'[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment— or *when it indisputably has no merit—when any reasonable attorney would agree that the*

*appeal is totally and completely without merit.*' [Citation.]" (*In re Reno* (2012) 55 Cal.4th 428, 513; *In re Marriage of Gong & Kwong* (2008) 163 Cal.App.4th 510, 516.) Courts apply both objective and subjective standards to determine whether an appeal indisputably has no merit, so as to warrant imposition of sanctions. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649; *Airlines Reporting Corp. v. Renda* (2009) 177 Cal.App.4th 14, 22.) "'The subjective standard looks to the motives of the appealing party and his or her attorney, while the objective standard looks at the merits of the appeal from a reasonable person's perspective. [Citation.] Whether the party or attorney acted in an honest belief there were grounds for appeal makes no difference if any reasonable person would agree the grounds for appeal were totally and completely devoid of merit. [Citation.]'" (*Airlines Reporting Corp. v. Renda*, *supra*, at p. 22.)

However, "[a]n appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals" (*In re Reno*, *supra*, 55 Cal.4th at p. 513), and "[c]ourts should employ sanctions sparingly to deter only the most egregious conduct" (*Airlines Reporting Corp. v. Renda*, *supra*, 177 Cal.App.4th at p. 22). At least one court has explained that, even if the arguments raised on appeal were not "supported by a careful reading of the statutes and case law," it was proper to not impose sanctions where it could not say that no "reasonable attorney familiar with this case would not have pursued some type of appeal for [the appellant] and it has not been shown the appeal was taken for an improper purpose or solely for delay . . . ." (*Cox v. County of San Diego* (1991) 233 Cal.App.3d

33

300, 314, overruled on other grounds in *Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925, fn. 8.)

Subjectively, it is clear from the record Anthony honestly believed the court erred in denying his OSC to temporarily modify child and spousal support, and in granting Wendy's request for permanent spousal support and attorney fees and costs. It is objectively reasonable that Anthony, who experienced significant financial hardships after the dissolution of his marriage to Wendy, to challenge an order that not only denied his request to temporarily modify his support payments but that also required him to pay Wendy $17,500 in attorney fees and costs and $500 per month in permanent spousal support. Because Anthony's appeal was not frivolous or taken solely for delay, we deny Wendy's request for sanctions.

## III. DISPOSITION

The judgment is affirmed. Wendy shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

SLOUGH
J.

34